THE PEOPLE *vs.* MORRIS.

The People
v.
Morris.

A general act of the legislature, forbidding the licensing of grocers to sell strong or spirituous liquors to be drank in their houses, and declaring the violation of such act a misdemeanor, *has the same operation within the bounds of incorporated cities and villages*, to the officers of which, by the charters thereof, the power is given to license grocers to sell liquor to be drank in their houses, that it has in the state at large, although the charters of such cities or villages were granted *previous* to the passage of the act creating the offence : unless such cities or villages are expressly exempted by statute from its operation.

The provision in the constitution of this state, requiring the *assent of two thirds* of the members elected to each branch of the legislature to every bill *creating, continuing, altering or renewing any body corporate or politic*, does not apply to *public corporations;* it applies solely to *private corporations*, such as banking institutions and the like. Laws affecting public corporations, such as cities and villages, may therefore be passed by mere *majority votes*.

Political powers conferred upon a corporation *for the local government of a place* are not *vested rights* as against the state ; and may be abrogated by the legislature, as well by a *general law* affecting the whole state, as by a *special act* altering the powers of the corporation.

An individual *corporator* cannot object to an act of the legislature altering, modifying or abrogating any power or franchise conferred by charter upon the corporation.

ERROR from the St. Lawrence oyer and terminer. The defendant was tried on an indictment for selling *spirituous liquors* and *permitting the same to be drank* in his grocery store, without having obtained a license as a *tavern keeper*. On the trial, he admitted that on various days between the 10th October and the 16th December, 1833, he sold *spirituous liquors* in his grocery, in the village of *Ogdensburgh,* received pay for the same, and permitted the liquor to be drank in his grocery, and that he had not at the time a license to keep a *tavern ;* but he insisted that he had a right so to do by virtue of a *license* to keep a *grocery*, granted to him by the *trustees of the village*, in pursuance of the *sixth* and *fourteenth* sections of the act incorporating the village of Ogdensburgh, passed 9th April, 1824, *vide Laws of* 1824, *sess.* 47, *ch.* 200, *p.* 236, and he produced such license, bearing date 1st October, 1833, authorizing him, for the term of three months to keep a grocery

and victualing house in the village, in which to sell fruit, victuals and liquor. The 6th section of the act incorporating the village, defines the powers of the trustees, and, amongst other powers granted, authorizes the trustees : " To regulate and license grocers, and keepers of victualing houses and ordinaries, where fruit, victuals and liquor shall be sold to be eaten or drank in such houses or groceries." And the 14th section authorizes the trustees to determine what sum shall be paid *for the use of the corporation*, not exceeding $25, for a license to retail liquor *to be drank in any grocery*, and to keep a victualing house in the village. The district attorney contended that the portion of the *revised statutes* which treats "Of Excise and the regulation of taverns and groceries," 1 *R. S.* 677, *et. seq.*, and which went into operation on the 1st January, 1830, *abolished* the power of the trustees of the village of Ogdensburgh to grant such license as had been granted to the defendant. Among the provisions of the revised statutes on this subject are the following: The supervisors and the justices of the peace of every town in the state are created commissioners of excise for such town. § 1. They have power to grant licences to *keepers of inns* and taverns, to sell strong and spirituous liquors and wines, *to be drank in their houses;* and they may grant licences to *grocers* to sell such liquors and wines in quantities less than five gallons, *but not to be drank in their houses, &c.* § 4. They are required to insert in every license to *grocers* an express declaration that such license shall not be deemed to authorize the sale of any liquor *to be drank in the house, &c.* of the person receiving it. § 12. Grocers are required to enter into bonds with surety, in the penalty of $125 that they will not sell strong or spirituous liquors to be drank in their houses, &c. § 13. A penalty of $25 is imposed upon whoever shall sell any strong or spirituous liquors and permit the same to be drank in his house, without having obtained a *license therefor as a tavern keeper*, § 16 ; and by the 25th § all offences against the provisions of this title are declared misdemeanors, punishable by fine and imprisonment. After the above and various other provisions, comes a clause in these words : " § 27. The preceding provisions of this title shall not extend to the city of New York ; *nor shall they*

*impair the powers of any corporation* of any other city, town or village, or of the trustees of any village, *specially authorized by law to grant licenses* to sell strong or spirituous liquors, but such powers shall be exercised *in the manner herein prescribed,* by such corporation or the officers authorized by it, instead of the board of commissioners of excise herein created." The counsel for the defendant insisted that the rights and privileges granted to the trustees, by the act of incorporation of the village, were *vested rights,* which could not be impaired or altered by construction or implication, drawn from a general law passed by the legislature ; but could be affected, if at all, only by an express legislative enactment, under the power reserved by the legislature to amend or repeal the act ; and then the act impairing the powers of the trustees must be passed in conformity to the *ninth* section of the *seventh* article of the *constitution,* which requires the assent of *two-thirds* of the members elected to each branch of the legislature to every bill *altering* any body politic or corporate, and insisted that the public prosecutor was bound to show affirmatively that the portion of the revised statutes relied upon by the prosecution had been passed with the assent of *two-thirds* of the members elected. The court ruled that they would presume that the law in question had been constitutionally enacted until the contrary was shown, and that they were of opinion that it abolished the powers of the trustees to grant such license as had been granted to the defendant in this case. The defendant was convicted and sentenced to pay a fine of $25. Having excepted to the decisions of the court, the defendant sued out a writ of error. The cause was argued here by

*J. A Spencer,* for the plaintiff in error.

*Greene C. Bronson,* (attorney general,) for the people.

*By the court,* NELSON, J. The defendant insists that the statute under which he has been convicted is inoperative, upon the grounds, 1. That the power or franchise of the corporation of the village of Ogdensburgh to grant licenses to *grocers* to sell spirituous liquors to be drank in their houses is a *vested right,* and cannot be impaired or taken away ; and 2. That if

ALBANY,
Jan. 1835.

The People
v.
Morris.

such power can be taken away, it can be done only by bill having the assent of *two-thirds* of the members elected to each branch of the legislature, in conformity to the 9th § of the 7th art. of the constitution of the state.

As to the first objection urged by the defendant. The only limitation to the powers of the legislative department that can exist, must be found either in the constitution of the United States or of this state, or in the natural and inherent rights of the citizens, which they cannot part with or be deprived of by the society to which they belong. The latter qualification is undefined, and perhaps undefinable by any general code, having a just regard to the security of these rights. Some of the constitutions of the states contain a declaration of these powers, and some also declare (and all are no doubt so to be understood) that the enumeration shall not be construed as denying or impairing others retained by the people. We have no bill of rights; though many of the principles usually found in such an instrument are incorporated in the provisions of the constitution. The enumeration was designedly omitted, because unnecessary, and tended to weaken, if not endanger those unnoticed. The limitation or qualification in this respect must depend upon the enlightened wisdom and discretion of the legislature, and the decisions of the judicial department. It is now considered an universal and fundamental proposition, in every well regulated and properly administered government, whether embodied in a constitutional form or not, that private property cannot be taken for strictly private purposes at all, nor for public without a just compensation; and that the obligation of contracts cannot be abrogated or essentially impaired. These and other vested rights of the citizen are held sacred and inviolable, even against the plenitude of power of the legislative department. If it should by enactment, plain and positive, subvert any or all of these rights, no constitutional prohibition existing in the case, doubts have been expressed whether there be any power in the government that could interpose and avoid the act. It is not material to examine that question. So far as the rights of person or property belonging to the citizen are concerned, under our form of government, they are generally definitely guarded by the

national and state constitutions. And when a plain and palpable violation of private right shall occur, not within the protection of either, and too apparent to admit of a presumption that the act was the effect of hasty or unadvised legislation, it will be time enough to inquire whether the power of the judicial department may not be invoked. It would be indelicate and presumptuous to anticipate such a case.

Vested rights are indefinite terms, and of extensive signification; not unfrequently resorted to when no better argument exists, in cases neither within the reason or spirit of the principle. Rights in one sense vested, that is, vested as it regards every other body or power except the government, are numerous, and the subject of common regulation, and even abrogation. All general and local laws, restraining the free action of the citizen as to person or property, the imposition of burthens and of duties, partake more or less of this character, and may be referred to, in illustration of the remark. Government was instituted for the purpose of modifying and regulating these rights with a view to the general good ; and under the constitution, the mode by which it was thought this great object might best be attained, was left to the wisdom and direction of the people themselves, acting through the medium of their representatives. We may concede to the defendant, that if any rights vested under the national or state constitutions, or others inherent and inalienable, and therefore also vested, have been violated by any provision of the revised statutes, such provision is inoperative and void. But if such rights have not been violated, we do not perceive how its penalties can be eluded. Now the defendant's rights are in no way improperly interfered with by the revised statutes, except so far as there may be an infraction of the corporate privileges of the village, bscause it will not be pretended that the right to sell spirituous liquors falls within the most extended class of vested rights. Nor can it be claimed that the right of any corporator, in his individual capacity, has been at all touched by this statute. It acts solely and exclusively upon the *powers* and *privileges* previously conferred upon the whole or aggregate body of citizens by the village charter. It is this power, thus previously granted to the corporation, which

ALBANY,
Jan. 1835.

The People
v.
Morris.

the revised statutes intended to modify ; not the private rights of any individual member of it.

What was the power thus conferred by the village charter? We answer, that it was wholly political. Instead of prescribing at their discretion every duty to be performed, and forbidding every act to be avoided—in a word, directing the whole system of government to be observed and executed—the legislature have merely defined the outlines and leading principles, and conferred upon the inhabitants, within the bounds of the corporation, the power at discretion to fill up, and carry them into operation. Strictly speaking, individual rights or private interests are no more involved in the arrangement than they are in the general laws, passed with reference to the government of a town, a county or the state. Their rights, as citizens of the government, subject to its control, and to be so regulated and directed as to harmonize with the general good, are those, and those only, within the contemplation of the charter.

Any person who will look into the powers and privileges conferred upon towns and counties, and their qualified right of self-government in reference to their domestic regulations, 1 *R. S.* 337 *to* 342, *id.* 364, and into the charters of the several cities and villages, will not fail to perceive that the only essential difference that exists between these corporate bodies, arises mainly from the difference in the extent of their territory, the density of their population, and the nature of their occupations. The towns are authorized by the legislature to elect a supervisor, clerk, overseers of the poor, assessors, commissioners of highways, &c. on whom the administration of their government in part devolves ; and so the charter of this village authorizes the inhabitants thereof to select five trustees, one collector, and one constable, on whom the administration of its government chiefly rests. In each, the powers and duties of the inhabitants and officers are more or less limited and defined, leaving whatever was deemed by the legislature expedient to the exercise of their discretion. The laws regulating each are adapted to their respective peculiar conditions and necessities. The powers delegated within the bounds of each, executive, legislative, and judicial, and the rights

vested in the inhabitants or respective corporate bodies, are of
the same kind, and designed to accomplish the same end, to
wit, the good government of the place.    The modification
and regulation of the political rights of the citizens, as mem-
bers of a community, are the purpose of the laws: private
interests are affected no farther than as they may be deemed
to conflict, or may in fact conflict with what the paramount
authority in the exercise of its discretion prescribes for the in-
terest and welfare of the whole.

It is an unsound and even absurd proposition, that political
power, conferred by the legislature, can become a vested
right as *against the government* in any individual or body of
men.    It is repugnant to the genius of our institutions, and
the spirit and meaning of the constitution; for by that fun-
damental law, all political rights not there defined, and taken
out of the exercise of legislative discretion, were intended to
be left subject to its regulation.    If corporations can set up a
vested right as against the government to the exercise of
this species of power, because it has been conferred upon them
by the bounty of the legislature, so may any and every officer
under the government do the same.    In the case of the *Ca-
nal Commissioners*, the canal board, the superintendents of the
common schools and salt springs, together with hundreds of
other officers in the state, on whom large political powers are
conferred, defined and undefined, was it ever dreamt that those
powers, in whole or in part, were held by any other tenure
than the will of the legislature?    They were created and
conferred upon these officers for the public good, and are
to be administered by them solely to that end.    Their pri-
vate interests are not only not concerned, but it would be a
gross violation of duty in such officers to act in reference to
them.    The species of power thus conferred is the same as that
bestowed upon the inhabitants of incorporated towns, cities
and villages.    Both are public trusts.    The rights are the
same to the extent of the power granted.    It is obvious, that
the principle would soon annihilate all government.    Indeed,
long before this time, if its authority had prevailed, nothing
would have been left in the administration of the govern-
ment of the state, subject to the action of the law making pow-

ALBANY,
Jan. 1835.

The People
v.
Morris.

er. The plain solution of this whole matter is, that political power conferred by the legislature is a public trust, to be executed not for the benefit or at the will of the trustee, but for the common weal. How long it shall exist, or in what manner it shall be modified, are questions independent of these depositaries, and belong exclusively to the people to determine, in the mode prescribed by the constitution.

But it is said that if the legislature possess the right to modify the charter, it can be effected only through the assent of two thirds of the members elected to each branch of the legislature, according to the 9th section of the 7th article of the constitution. Assuming, for the present, that this section applies to *public corporations*, which will be hereafter examined, I am disposed to deny this position in its unqualified extent In regard to this section, there is no doubt considerable difficulty in laying down any fixed rule, and sustaining it by satisfactory reasons, distinguished between the power of the legislature to pass general laws, applicable to every citizen and place within the state for the public good, and which must necessarily act more or less incidentally upon the interests and rights of corporate bodies, so far as they are concerned—and those laws passed for the express purpose of modifying or altering the charters of corporations. As far as such incidental modification extends, the effect is the same : the act of incorporation is altered. A distinction, however, we are satisfied must exist. " A majority of each house (that is, of the senate and assembly,) shall constitute a quorum to do business." *Constitution, art.* 1, § 3. And by the common law, and parliamentary usage, a majority of the quorum are competent to enact a law. " The assent of two thirds of the members elected to each branch of the legislature shall be requisite to every bill, &c. creating, continuing, *altering* or renewing any body politic or corporate." *Art.* 7, § 9. A literal interpretation of this clause, no doubt, would obliterate the distinction above taken ; but such an exposition would lead to a perversion of the intent of the framers of the constitution, and would most injuriously and lamentably fetter the legislature of the state. It would exempt these corporate bodies from a great mass of the most wholesome enactments. It is upon

the principle of this distinction that the various local and state taxes are imposed, or that the amendment of these laws can bind them—that the numerous prohibitory statutes enforced by the imposition of penalties, can include them—the assessments for state or local improvements made upon their property—their property taken for public purposes or abated when it becomes a nuisance, by *majority votes*. In fine, the regulation of the internal police of the state, so far as these institutions are concerned, must rest upon some distinction or qualification like the one alluded to. The clause of the revised statutes under consideration belongs to this portion of the law. It qualifies the mode of vending and using distilled spirits throughout the state, for the purpose of diminishing the evil consequences flowing therefrom—an act tending to promote good morals throughout the land, at least so designed. It will also be readily perceived, that the operation of general laws, passed exclusively with regard to the public welfare, like those above referred to, may not unfrequently forbid the corporator, as a citizen, from doing what perhaps the charter authorized, and so *vice versa*. Many of the rights and privileges conferred upon these corporate bodies, especially as it regards private corporations, are frequently nothing more than are possessed by each corporator in his individual capacity. The law has clothed the aggregate body with the same for special purposes. Are they more sacred and inviolate when found upon an artificial body, in view of th ; constitution and laws, than when belonging to a natural person ? The latter derives them from nature and the society to which he belongs—sources as high and authoritative as those from whence the former are drawn. The rights of individuals are confessedly the subject of the general regulation of the state. The immediate object of the government is to control and harmonize them for the benefit of all. Are those conferred upon ideal bodies an exception ?

We are however of opinion that the above view is not required to sustain the modification of the charter in this case, for the reason that the constitutional provision does not apply to public corporations. That the village of Ogdensburgh is " a body politic and corporate " is not denied. The charter

　　　　　　　　　CASES IN THE SUPREME COURT

ALBANY,
Jan. 1835.

The People
v.
Morris.

falls within the definition of Lord Coke and of other approved authors. "A body politic," he says, "is a body to take in succession, framed as to its capacity by policy, and therefore is called by Littleton, (§ 413,) a body politic; and it is called a corporation or body corporate because the persons are made into a body, and are of capacity to take, grant, &c. by a particular name." *Viner's Abr. Corp. (a. 2.)* A public corporation is also defined to be, "An investing the people of a place with the local government thereof." This latter description is the most appropriate, and is justified by the history of these institutions, and the nature of the powers with which they were and are invested. The forming of cities into communities, corporations, or bodies politic, and granting them the privileges of municipal jurisdiction, contributed more than any other cause to introduce regular government, police and arts, and to diffuse them over Europe. Some of the cities assumed the necessary privileges, and formed themselves into bodies politic under a government established by common consent. Others purchased them from their superiors, or acquired them gratuitously from the generosity of the prince, and to enable him to counterbalance the powers of the aristocracy. The feudal government had degenerated into a system of oppression, and the great body of the people were subjected by the power of princes, or superior lords, to the most degrading and intolerable servitude. Many of the English charters incorporating cities and towns were likewise acquired by means of an appeal either to the fears, avarice, necessities, or generosity of the crown, and, like those on the continent, are to be viewed, as they in truth are, in the nature of a bill of rights. It was the acquisition of so much liberty, conceded by or extorted from a sovereign claiming nearly absolute power; and hence the idea of inviolability, so generally and justly attached to them. They were constitutional charters, which the crown could not encroach upon without violating the freedom of the subject. Most if not all the leading cases in the books, involving the question of the inviolability of these charters in the English courts, arose between *the prerogative of the crown* and the corporation. The right or power of *parliament* in England, or of the legislature here, to interfere with these

bodies, created as auxiliaries to be employed in the government of the state, would present quite a different question. Viewing these corporations as instituted for the purpose of exercising mere municipal jurisdiction—a power public and political, and which by the constitution itself belongs to the legislative department—do they fall within the fair intent of the two-thirds provision ?

The fact conceded, that they are " bodies politic and corporate" is not, by fair reasoning, necessarily conclusive. So are towns and counties, for they come within one or other of the above or most approved definitions. They possess every requisite to constitute them corporations, besides being declared to be so by statute, as are also superintendents of the poor and trustees of school districts. 1 *R. S.* 337, 42. *id.* 364, 486, 617, 498. Each town, as a body corporate, has capacity to sue and be sued ; to purchase and hold real estate ; to make such contracts and hold such personal property as may be necessary to its corporate and administrative powers ; and to make such order for the disposition, regulation and use of its public property as may be conducive to the interest of the inhabitants. Large powers are also conferred, as has already appeared, in respect to their municipal and domestic regulations. So in respect to superintendents of the poor. It is expressly declared, 1 *R. S.* 617, § 16, " they shall be a corporation by the name of the superintendents of the poor of the county for which they shall be appointed, and shall possess the usual powers of a corporation for public purposes." Large powers are conferred upon them also, to enable them to execute their trust, and especially for the " good order and government of the place and poor houses belonging to the county, for the employment, relief, management and government of the persons placed under their care." The trustees elected in a town having lands belonging to it for the support of the gospel, or of schools, or both, " shall be a corporation for the purposes of their office, by the name of the " Trustees of the Gospel and School Lot," in the town in which they are elected. They shall have power, "besides the ordinary powers of a corporation," to manage these lots as particularly set forth in the statute, 1 *R. S.* 497, 8. Other

cases might be referred to.' That they come within the *letter* of the provision is not enough, unless the different bodies above alluded to are also included, which probably will not be pretended ; for, if so, most of the legislation of the state must be in conformity to this provision of the constitution.

Are they within the evil this provision was designed to remedy ? No one, I think, acquainted with the history of the times, or with the introduction of this clause into the constitution, will venture upon this ground. It may be fortunate for truth, and what is deemed a sound exposition of this provision, that all who may desire to examine it, can recur to his own recollection, and challenge that of others upon this point. We think we hazard nothing in asserting that the multiplication of cities or villages by the legislature has at no time been a subject of complaint. Only *four* of the former existed in the state at the adoption of the constitution. The latter, which were somewhat numerous, have always been viewed by the people of the state as a matter in which the inhabitants of the villages were exclusively interested, and to be left to their option. But *private incorporations* had multiplied to an extent that had attracted public attention, especially *banking institutions.* These had been sought for with zeal, and their enactment attended with circumstances that awakened public suspicion and alarm. So extreme had the evil become at one period of our history, that the chief magistrate of the state felt it his duty to exercise the power then existing in the constitution, of proroguing the legislature, and was triumphantly sustained by the people in the execution of this high and delicate trust. The fact affords strong evidence of the deep impression made upon the public mind as to these and *similar* private corporations, and of the scope and purpose of the clause on this subject. If we resort to the history of its introduction into the new constitution, the above view will be confirmed. Mr. *King*, chairman of the committee of the legislative department, reported the section ; and when it came under consideration, said that the committee had looked upon the multiplication of corporations as an evil ; they had been created for a great variety of purposes ; they were exceptions to the common law ; they could not be proceeded against in

the ordinary way of prosecutions against individuals in courts of justice ; they ought not to be increased, but should be diminished as far as could be done consistently with the preservation of vested rights. It is obvious, though the language used in the clause in question is general, that the honorable chairman had in his mind (and he spoke for the committee) the case of private corporations ; that the great inducement to the adoption of the clause was a check upon them ; and that the organization of communities, and the investing them with the privileges of mere municipal jurisdiction and authority, were not at all in contemplation.

The distinction between public snd private corporations is strongly marked, and, as to all essential purposes, they correspond only in name. We speak of the erection of a town or county, and the term would be just as appropriate when applied to cities or villages. They are severally political institutions, erected to be employed in the internal government of the state. There is no contract between the government and governed, for but one party is concerned—the public; and the inhabitants upon whom the powers and privileges are conferred are mere trustees, who hold and exercise such powers for the public good. The only interest involved is the public interest, and no other is concerned in their creation, continuance, alternation, or renewal. The nature and operation of these corporations repudiate the idea of vested rights, and therefore no evil arising out of them could have influenced the convention. *We know of no vested rights of political power, in any citizen or body of citizens, except those conferred by the constitution.* That is our bill of rights, and is analogous to those granted to kingdoms or minor communities, such as towns and cities, by princes and superior lords on the continent, or by the crown of England.

*Private corporations* are the private property of the corporators. They are designed to regulate private interests. Large investments are made in pursuance of their authority, and the tenure by which such corporate property is held is like that of an individual to his farm or personal estate ; and an invasion of such corporate power is like a violation of private right.

Vol. XIII. 43

ALBANY,
Jan. 1835.

The People
v.
Morris.

One of the strongest reasons why these private corporations should be cautiously granted, arises from the inviolability of the rights required under them; for, notwithstanding the reserved power in the charter to modify or repeal, an interference seriously affecting this species of property is calculated to shake public confidence in the security of these corporations generally, and might and probably would be immediately disastrous to the property invested under their faith, in the particular instance in which the legislature exercised its reserved power. This wide distinction was well known to the members of the convention, and shows that the clause in the constitution may be fully satisfied by confining its operation to the case of private corporations. Nor can it be admitted that it was intended to restrict the action of the legislature, in the municipal regulations of the state, as to one place more than another, or that less latitude was to be given to such regulations in the government of the citizens residing within the bounds of cities and villages, than of those residing in towns and counties. The nature and object of the power exercised, and the claims of those concerned, are alike, and its difficult to discover any solid reason for the distinction. All our public laws, civil and criminal, however important or severe their operation, enacted for the good government of the people throughout the state, are passed by *majority votes ;* and it would be inconceivably strange, if laws passed with a view to a more perfect government of a particular place (laws better adapted to the orginazation of society and the business and condition of the governed residing in small districts) should depend upon a different and greatly restricted rule of action on the part of the legislature.

Judgment affirmed.*

---

* *Vide Ex parte Harrington & Hubbell* v. *The Trustees of the Village of Rochester,* 10 *Wendell,* 547, in which *it was held* that the provisions of the revised statutes, forbidding the licensing of *grocers* to sell spirituous liquors to be drank in their houses, extends to *every part of the state,* (except the city of New York,) including *villages* the officers of which were authorized by their charters to grant such licenses.