## GIFFORD, President of the Farmer's Bank of Hudson, *vs.* LIVINGSTON.

The act entitled " An act to authorize the business of banking," passed 18th April, 1838, was constitutionally passed, although it did not receive the assent of two-thirds of the members elected to each branch of the legislature, and is a valid act. The case of *De Bow* v. *The People,* (1 *Denio,* 9,) overruled.

ON error from the supreme court. Gifford, as president of the Farmer's Bank of Hudson, an association organized under the act " to authorize the business of banking," sued the defendant in error in the supreme court in *assumpsit,* as maker of a promissory note. The declaration, which contained the common counts, stated that the plaintiff prosecuted for and on behalf of the association; and the indebtedness and the promise to pay, as laid, were to the association, no cause of action personal to Gifford being stated. The defendant demurred, and the plaintiff joined in demurrer. The supreme court, following the case of *De Bow* v. *The People,* (1 *Denio,* 9,) gave judgment for the defendant, upon which the plaintiff brought error here.

*S. Stevens & George Wood,* for the plaintiff in error, insisted, *first,* that the validity of the general banking law had been established by this court in the case of *Warner* v. *Beers,* (23 *Wend.* 103, 190.) They maintained that it was there determined that the law was constitutionally enacted although it might not have received the assent of two-thirds of the members elected to each branch of the legislature. *Second,* that the general banking law was not an act creating a body politic or corporate within the sense of the provision of the constitution requiring such acts to be passed by two-thirds of the members of the legislature.

*H. Hogeboom,* for the defendant in error, cited *Thomas* v. *Dakin,* (22 *Wend.* 9;) *Delafield* v. *Kinney,* (24 *id.* 345;) *The*

*People* v. *The Assessors of Watertown*, (1 *Hill*, 616;) *Willoughby* v. *Comstock*, (3 *id.* 389;) *The People* v. *The Supervisors of Niagara*, (4 *id.* 20;) *Matter of the Bank of Dansville*, (6. *id.* 370;) *De Bow* v. *The People*; (1 *Denio*, 9;) 2 *Jac. Law Dic.* 94, *Corporation*, 1; 2 *Kent's Com.* (3d ed.) 276, 287; *Angell & Ames on Corp.* 17, 21, 23, 38, 45, 54, 75; *Denton* v. *Jackson*, (2 *John. Ch. R.* 324;) 10 *Co.* 27; 1 *Kyd on Corp.* 2, 4, 9, 13, 17, 52, 62, 63, 69, 70; *Dyer*, 100, *pl.* 70; *North Hempstead* v. *Hempstead*, (2 *Wend.* 133;) 1 *Bl. Com.* 467, 475; *Dartmouth College* v. *Woodward*, (4 *Wheat.* 518.) He also referred to the cases cited in *Warner* v. *Beers*, (23 *Wend.* 103.)

THE CHANCELLOR. In the case of *Warner* v. *Beers, President of the North American Trust and Banking Company*, (23 *Wend. Rep.* 103,) which came before this court during the session of the legislature in the spring of 1840, I stated at length my reasons for believing that the associations authorized by the general banking law were in fact corporations; that is, that they undoubtedly belonged to the class of artificial but organized bodies, capable of holding property, rights and immunities in common, and of transmitting the same by an artifical succession, which in legal language were called bodies corporate, or corporations. I at the same time stated the reasons which had led me to the conclusion that they were not, however, such bodies corporate as came within the spirit and intent of the section of the constitution requiring a vote of two-thirds of all the members elected to each branch of the legislature: that is, that a general law authorizing all and any of the citizens of the state to organize themselves into artificial bodies for the purpose of carrying on any trade or business, or of holding and transmitting property in an artificial succession, was not within the spirit and intent of that provision of the constitution, and might be passed by a majority vote. Those reasons are published in the report of the case of *Warner* v. *Beers*, and it is therefore unnecessary to repeat them here. As the judgment of the court in that case was in accordance with my opinion, as then expressed, upon

the last point, and its decision in a more recent case has confirmed my opinion upon the point that these associations are in fact corporations, I shall proceed to consider the question 'whether the judgments of this court in that and other cases are in conflict with each other; and whether the decision in the case of *Warner* v. *Beers* ought not to be considered as having settled the question of the constitutionality of the general banking law in favor of the plaintiff in error in the present case.

The declarations in the case of *Warner* v. *Beers*, and in the case now under consideration, are the same in substance; that is, in each case the suit is brought in the name of the president of the bank upon an alleged indebtedness to the association, and not to him. In both cases the declaration was demurred to, upon the ground that an indebtedness to the association was no sufficient foundation for a promise to the president, so as to authorize him to sue for the debt in his own name, if the law creating the association and authorizing it to sue for its debts in the name of its president was unconstitutional and void. In the case of *Warner* v. *Beers* the supreme court gave judgment for the plaintiff upon the demurrer, and this court affirmed that judgment. In the present case, that court has given judgment for the defendant upon the demurrer on the same state of facts presented by the pleadings. It necessarily follows, that if the judgment of the supreme court in the case now under consideration is right, the judgment of that court, as well as of this, in the previous case of *Warner* v. *Beers*, was erroneous. It is true the difference between these two judgments of the supreme court arose from the fact that in the case of *Warner* v. *Beers*, or rather in the case of *Thomas* v. *Dakin*, (22 *Wend. Rep. 9*,) which was the pioneer cause in that court, it was erroneously supposed by the two judges who concurred in the decision in favor of the plaintiff, that they could not take judicial notice of the fact that the law was passed by a majority vote merely. I was inclined to the same opinion at that time, as will be seen by the report of the case of *Warner* v. *Beers ;* though I was careful to put my vote for the affirmance of the judgment upon the ground that the general banking law was constitutional even

Gifford *v.* Livingston.

if the same had not been passed by a two-thirds vote. And **as** I shall hereafter show, I adopted the proper course, as authorized by the rules of this court, to ascertain whether the members who had voted for the affirmance of the judgment of the court below. placed their decision upon the technical ground that they could not judicially take notice of the manner in which the law was passed, or upon the constitutionality of the law itself even if it was passed by a majority vote only, as we all know it in fact was.

The learned chief justice is under a mistake in supposing that the resolutions appended to the report in the case of *Warner* v. *Beers* were extra-judicial, or that they were adopted after the case was finally decided, and when there was nothing before the court for adjudication. He was undoubtedly misled by the fact that, by an error of the clerk of this court in making up his minutes, the judgment was dated on the seventh of April, when the first vote was taken, and not upon the twenty-second of that month, when the final judgment of this court was actually given. The cause was heard during the session of the legislature, when the court was in the practice of meeting semi-monthly only, for the purpose of hearing special motions. From the manner in which this court is constituted it is imposible for the members thereof to meet together in private and compare their opinions previous to a decision of the cause. Hence has arisen the prac- tice of calling for the written and oral opinions of such members as think proper to give them, and then to take a vote upon the general question of affirmance, or reversal ; which vote is only preparatory to the final judgment to be given by the court. And where different questions arise and are discussed, it some- times becomes necessary, to enable the courts below to carry the decision of this court into effect, to ascertain the grounds upon which its judgment is based. The 26th rule of the court therefore provides, that where the decision of a cause depends upon distinct questions, the determination of either of which will dispose of the cause, the question shall be taken separately, if re- quired by any three members. And the practice has always been, since I have been a member of the court, when a separate vote was to be taken upon different questions which had arisen

and been discussed, to take such vote after the vote upon the general question of affirmance or reversal, and before the final settlement of the judgment of the court. In the case of *Warner* v. *Beers* such distinct questions did arise; the votes upon which questions it was important to the public and to suitors in the courts below should be taken separately, to prevent the necessity of having them again brought before this court for decision. The supreme court had decided, in fact, that the general banking law was unconstitutional; as it was well known that it had been passed by a majority vote only. But that court had rendered judgment in favor of the plaintiff in the court below upon the merely technical ground that the court could not take judicial notice of the fact that the law was not passed by a vote of two-thirds. If every member of this court, therefore, was of opinion that the decision of the supreme court was wrong upon both of these questions, his vote must still have been given in favor of the affirmance of the judgment of the court below; for that judgment could not be erroneous if the general banking law was constitutional. And a general affirmance without stating the real grounds upon which the judgment of this court was placed would necessarily lead to the conclusion that if the fact of the passage of the law by a majority vote only had been stated, in a plea, the defendant in the court below would have been entitled to judgment. At least the supreme court, as well as all inferior courts, would have felt bound so to decide, in accordance with the reported decision in the case of *Thomas* v. *Dakin.* Immediately after the vote upon the general question of affirmance or reversal was taken, on the 7th of April, 1840, I therefore considered it my duty to suggest the necessity of having the questions taken separately for the purpose of ascertaining the fact whether the affirmance of the judgment was placed upon the technical ground taken by the supreme court, or upon the broader ground that the judgment was right because the general banking law was constitutional although it was not passed by a two-thirds vote. But as senators wished to resume their legislative duties, or because the usual time for adjournment had arrived, the court was adjourned over until the next

day for the purpose of taking the vote upon that question separately. I then introduced the first resolution which is appended to the report of the case, and it was immediately passed with but one dissenting vote. That resolution did not ask for a decision of the question whether the court could take judicial notice of the fact that the law was passed by a majority vote only; but it expressed the opinion of twenty-three members of this court, who had heard the question argued at great length and with much ability on both sides, that the opinion of the supreme court that the law was unconstitutional unless it had been passed by a two-thirds vote was erroneous. The judgment of affirmance in this court was therefore placed upon the distinct ground that the law was constitutionally passed, although two-thirds of all the members elected to each branch of the legislature might not have voted in favor of its passage. After the adoption of that resolution, another was introduced by a member of the court who had expressed an opinion that the associations under the general banking law were not bodies politic or corporate. That resolution was opposed by Senator Paige and other members of the court, who thought they were in fact corporations, but who agreed with me in the opinion that the constitutional prohibition did not apply to general legislation of this kind. The further consideration of the subject was thereupon postponed until the next meeting of the court on the third Tuesday of April. At the meeting of the court upon that day, the mover of that resolution consented to modify it, by adding thereto the words, "*within the spirit and meaning of the constitution.*" And as that rendered it consistent with the opinions of those who believed they were in fact corporations, but that the constitutional restriction did not apply to general laws of this description, it was allowed to pass without farther opposition. Both resolutions were thereupon directed to be incorporated into the record of the judgment of this court, which was then finally settled and remitted to the supreme court to be carried into effect there. If the opinion of the justices of the supreme court in the case of *Thomas* v. *Dakin*, declaring that the associations organized under the general banking law were unconstitutional un-

less the law had been passed by a two-thirds vote, was not in itself extra-judicial and entitled to no weight whatever even in that court, I cannot conceive how the expression of a contrary opinion by twenty-three members of this court, when the same question came here for decision, can in any sense be considered as extra-judicial and as entitled to no weight in any court as a judicial decision.

It remains to be seen whether any subsequent judgment of this court can properly be considered as having unsettled this decision upon the constitutional question, as to the validity of associations organized under the general banking law, which had been thus distinctly and explicitly made here, in the case of *Warner* v. *Beers*. The learned chief justice, in the case of *De Bow* v. *The People*, (1 *Denio's Rep.* 9,) supposes that the decision of this court in the case of *Purdy* v. *The People*, (4 *Hill's Rep.* 384,) has, by overruling one of the reasons assigned by Mr. Justice Nelson for the judgment of the supreme court in the case of *The People* v. *Morris*, (13 *Wend. Rep.* 325,) necessarily impaired the decision of this court in *Warner* v. *Beers*, which was to some extent based upon similar reasoning. It is sufficient to say, that the judgments in all three of those cases may well stand together. The case of *The People* v. *Morris* did not, as in the case of *Purdy* v. *The People*, arise upon the modification or alteration of the powers of a single municipal corporation, by an act of direct legislation altering the chartered rights or powers of a particular corporation only. But the powers of the corporate officers of the village of Ogdensburgh, which were in question in the case of *The People* v. *Morris*, had been modified and altered by an act of general legislation, relative to the excise laws of the whole state; which act affected the right to grant retail licences which that corporation, as well as the corporations of other villages and cities, previously possessed, under their several charters. And one of the justices of the supreme court, in commenting upon that case in *The People* v. *Purdy*, (2 *Hill's Rep.* 39,) says "the difference between a general excise law extending alike to the whole state, and a law touching the charter of a

single city, is too manifest to require any illustration." That is precisely the distinction which I attempted to draw in the case of *Warner* v. *Beers*, between an act of general legislation extending alike to the whole state, authorizing any association of individuals to exercise corporate powers for certain purposes, and that special legislation for the benefit of particular individuals, or for local projects, against which the two-thirds provision of the constitution was intended to guard. And the decision of this court upon the writ of error in the case of *Purdy* v. *The People*, even if it conflicted with so much of the opinion of the late Chief Justice Nelson in *The People* v. *Morris*, as held that a public or municipal corporation might be created or altered by a mere majority act of special legislation, applicable to such corporation alone, did not in any degree impair the principle that general legislation is not within the spirit and intent of the constitutional restriction; upon which principle the decision in *Warner* v. *Beers* was attempted to be placed by those who believed the associations authorized by the general banking law were in fact corporations.

The case of *The Supervisors of Niagara* v. *The People*, decided by this court in December, 1844, but not yet reported, as I understand that case, so far from impairing our decision of April, 1840, is a direct authority in favor of the constitutionality of the associations created under the general banking law. That decision does, it is true, declare them to be corporations. But the actual judgments given by the supreme court and by this court in that case can only be sustained upon the supposition that such associations were legal and constitutional corporations, so as to be taxable as corporations under the general tax law. For if they were merely illegal and unauthorized associations of individuals, their property would not have been taxable as corporate stock at the place where the office of the association was located, and by the corporate name; but each individual stockholder would be taxable for the actual value of his interest in such stock, so far as that interest consisted of personal estate, according to the directions of the general tax law. The mandamus asked for in that case was to compel the supevrisors of the county of Niagara to

place the name of one of these associations upon the assessment roll, and tax it as a corporation; and the supreme court awarded a peremptory mandamus accordingly. That judgment was brought to this court upon a writ of error, and was affirmed. Now it is evident that if the general banking law was unconstitutional, an association attempted to be created under it would have no legal existence as a corporation, and could not therefore be taxed as such. In the language of one of our most able and distinguished judges, if the general bank law was not a constitutional exercise of power on the part of the legislature, it follows that there was no such legal being as the Bank of Lockport to be taxed. And the court might with the same propriety have granted a mandamus to compel the supervisors to restore the name of "the town pump of Lockport" to the assessment roll, and to tax it as a corporation. The judgment of the supreme court now under consideration appears, therefore, to be in direct conflict with the judgments both of that court and of this in the Lockport case, as well as with our previous decision in *Warner* v. *Beers*. In justice to the supreme court, however, it is proper to say, I have been informed by the chief justice of that court, that the counsel in the Lockport case did not advert to the fact that the banking association *could not be taxable as a corporation if the general banking law was an unconstitutional act.*

If ever there was a case in which the principle of *stare decisis* should be applied to the decision of the court of dernier resort, so far as relates to subsequent judicial action upon the same question, this appears to be a proper case for the application of that principle. Since the decision of this court, in April, 1840, millions have been invested in the stocks of these associations, and loaned out to individuals upon the faith of that decision. The bills of those associations *to an immense amount* are also in circulation and in the hands of the citizens of the state and others, who have no other security for their payment than the debts due to such associations and the bonds and mortgages and stock which have been given to or purchased by these associations, and transferred to the comptroller for the pro-

Gifford *v.* Livingston.

tection of their bill holders; all of which debts, securities and transfers will probably be invalid, if these associations, by the reversal of the former decision of this court upon that question, are now declared to have had no legal existence. By a reference to our statute books, it will also be seen that, since 1840, many important general laws, materially altering the chartered rights and powers of particular classes of corporations, such as rail-road companies, safety fund banks, free banks, &c. have been passed by majority votes merely; which laws depend for their constitutional validity and existence upon this principle, on which the judgment of this court in the case of *Warner* v. *Beers* is based; that the two-thirds provision of the constitution was not intended to apply to such general legislation. (*See Laws of* 1843, *p.* 299; *Id.* 1844, *pp.* 35, 416; *Id.* 1845, *pp.* 91, 145, 224, 251.) No one can estimate the amount of public injury as well as of individual suffering and loss which will occur if these associations, and the law under which they were created and other general laws depending upon the same principle, should now be declared unconstitutional by a reversal of our former decision on this question. I trust, therefore, that this court will adhere to that decision, and that the judgment of the court below in the case under consideration will be reversed.

*Senators* BOCKEE, BARLOW, LOTT, FOLSOM and JONES also delivered written opinions in favor of reversing the judgment of the supreme court, on the ground that the question had been determined by the former decision of this court in the case of *Warner* v. *Beers,* but without expressing any opinion upon the point as an original question.

HAND, Senator. The inquiries, whether the question raised in this cause has been fully passed upon by this court in the case of *Warner* v. *Beers,* (23 *Wend.* 103,) and if so, whether the maxim of *stare decisis* should control our decision here, naturally first present themselves. If the answers to these in-

quiries are not decisive, then the naked question of the consti-
tutionality of this law arises.

. The history of judicial opinion upon the clause of the con-
stitution in question (*Art.* 7, *sec.* 9,) is somewhat singular. In
the case of *The People* v. *Morris,* (13 *Wend.* 325,) the su-
preme court in the year 1835 decided that public corporations,
as cities, villages, &c., were not within the provision. The
same court, in *Thomas* v. *Dakin,* (22 *Wend.* 9, *determined in*
1839,) held that an association under this general banking
law was a corporation. A few months afterwards, this court,
in the case of *Warner* v. *Beers,* after an elaborate argument,
gave judgment for the plaintiff on a note given to one of these
institutions. Two resolutions were at the same time passed by
this court; one to the effect that the law was constitutional
without having been passed by a two-third vote; the other,
that these associations were not "bodies politic or corporate
within the spirit and meaning of the constitution." In the case
of *The People* v. *The Assessors of Watertown,* decided in 1841,
(1 *Hill,* 616,) the supreme court held that these associations
were corporations, and as such liable to be taxed. The next
year this court, in the case of *Purdy* v. *The People,* (4 *Hill,*
384,) determined that this clause of the constitution included
*all corporations,* public as well as private. And finally, at the
last term, in December, 1844, this court in the case of *The Su-
pervisors of Niagara* v. *The People,* held that these institu-
tions were "monied or stock corporations," and liable to be
taxed as such. So that we have a resolution of this court, that
they are "not corporations within the spirit and meaning of the
constitution ;" and also decisions of the same court that the con-
stitutional provision includes all corporations; and then again,
that these associations are "monied or stock corporations."

The case of *Warner* v. *Beers* had been decided in the supreme
court in favor of the plaintiff, upon the ground that the court, on
the pleadings in that case, would presume the law to have been
passed by the constitutional number of votes. One judge dis-
sented on the ground that only one corporation could be created
by a single statute, even by a two-third vote. Neither of the

Gifford v. Livingston.

members of the court questioned the doctrine that the act must be presumed to have been passed by the requisite number of votes; and in the court of errors the learned chancellor favored this view of the case. By the 26th rule of this court, when the decision of a cause depends upon distinct questions, either of which " will dispose of the cause;" these questions may be taken separately. But a resolution cannot, by the terms of the rule, be considered as a judgment of the court, except when it decides some principle upon which the judgment of the court in the cause, must necessarily rest; for without this, it does not " dispose of the cause." All else is extra-judicial. " A judgment is a judicial opinion in answer to a question caused by a suit." (*Ram on Judg.* 20; 3 *Bl. Com.* 395.) It must be on the question before the court; and necessary to decide the case and essential to its decision. If the opinions expressed are not so, they are always considered extra-judicial, and indeed are quite often mere *obiter* remarks. Lord Bacon said of Coke's reports, although he commended them highly, "they may have errors and some *peremptory and extra-judicial resolutions* more than warranted." In so numerous a body as this court it is not surprising that many different reasons should be expressed, even though the members arrive at the same final judgment. A difference in reason is not a difference of opinion. (2 *Ld. Ray.* 938, 950; *Willes,* 20.) And a judgment may be valid though the reasons are faulty. (*Newton* v. *Cowie,* 4 *Bing.* 234; *Lewis* v. *Lewellyn,* 1 *Tur. & Rus.* 104.) So in the case of *Warner* v. *Beers,* the cause might have well been decided by a majority of this court, on the reasons which influenced the supreme court in the same case; and as it might be so, the resolutions passed afterwards were not necessary to dispose of the cause. So the supreme court have constantly viewed the matter, and so too, from its subsequent action it seems to me this court must have done. I am fully aware that opinions affirming the constitutionality of the general banking law were delivered in that case, by some of the strongest and keenest legal intellects of the land, and those opinions command my unfeigned respect, for their great legal acumen and research,

and the argumentative powers displayed; but if not necessarily the foundation of the judgment given, they do not preclude further consideration of the subject. Had a majority of the court resolved also that the pleadings did necessarily raise the constitutional question, then one at least of these resolutions would have been a necessary ruling in the cause.

But again, if the judgment in that case was directly and necessarily upon the constitutionality of the law, is it a case to which the principle of *stare decisis* applies in its full force? While another maxim, "*humanum est errare*" remains true, there must occasionally be a reconsideration and overruling of human judgments. If on a re-examination the former error is clear, our duty is plain. We must be as Lord Coke said Sir John Fortescue was, "not amongst the number of those *qui suos amassent errores,* but one of those who yielded to the truth when he found it." (*Preface to* 10 *Rep.*) To overrule a decision clearly erroneous on principle, is always a duty, even where the constitution does not interpose; unless there has been a uniform course of corroborating decisions for a series of years, and even then, the principle of *stare decisis* has been most strongly applied in real estate cases. I believe that a single decision has never, in any case, been allowed to stand if found opposed to principle. (*Walingham* v. *Baker. Hardr.* 52; *Tapner* v. *Merlott, Willes,* 182; *Welles* v. *Trahern, id.* 240; *Vaughn,* 382; *Vere* v. *Ld. Cawdor,* 11 *East,* 570; *Williams* v. *Jermaine,* 7 *Barn. & Cress.* 468; *Smith* v. *Compton,* 3 *B. & Ad.* 200.)

The able counsel who appeared for the plaintiff in error, pressed upon our consideration the importance of the stability of judicial opinion, and particularly in this court of final resort. Many reasons were addressed to us to show the importance of a rigid adherence to the case of *Warner* v. *Beers.* The argument of public convenience, and also the wisdom of the ancients were pressed into their service; the ever venerated maxims of the peripatetic Stagyrite were cited. No one more than myself feels the force of the doctrine of *stare decisis.* As a lawyer, I am accustomed to revere the decisions of legal tribunals. They

Gifford v. Livingston.

are the sources of our common law, and indeed the expositors of the rights of the citizen. The deliberate and well established principles of the common law are sacred to every true friend of civil liberty. It is often said that the certainty of the law is more important than its reasons; and that the accurate knowledge of what *is* the law, is often more important than the precepts of the law itself. Its stability and certainty are necessary to the business and prosperity of civilized life; "*misera servitus, ubi lex aut vaga aut incognita est.*" I have felt the full force of this part of the argument of the plaintiff in error, and weighed the subject with the keenest sense of responsibility. But no law can be permanent which is destitute of principle, and particularly in this country, if it conflict with the plain provisions of the constitution. And if a law be constantly questioned, it is better at once to put the matter at rest than to allow its constitutionality to remain a vexed question. If the sentiments of Aristotle are to be appealed to, I think they will in no wise sustain an unconstitutional decision. Anciently the laws were in verse and sung in public, that they might be remembered. (*Eden's Penal Law*, 312.) And in some parts of Greece they were entrusted to memory alone, and there too, the people had the ultimate decision. The people were jealous of any change, and penalties were threatened upon him who proposed it; and in some places he who did so, did it with a halter around his neck. (*Butler's Horæ Juridicæ*, 11, 12.) It was in relation to these "constitutional" laws "by the people," that a change was deprecated; and of these another ancient writer said, "we ought to maintain unaltered the laws of our country, and respect them as certain secondary divinities." And yet Aristotle complains that "a constitution may be one kind by law, and of another in fact." I hope the remark will never be justified in this country.

Again; the case of *Warner* v. *Beers* seems to be shaken by every subsequent decision on the subject; and in case of a conflict of decisions, the principle of *stare decisis* does not hold. [*Emanuel* v. *Constable*, 3 *Russ.* 436.) The case of *The People* v. *Morris*, (13 *Wend.* 325,) no doubt had an influence upon

it, and that decision is overruled by this court in *Purdy* v. *The People*, (4 *Hill*, 399.) It is said that the case of *The Supervisors of Niagara* v. *The People*, in this court, does not raise the question of corporation or no corporation. But I do not see how that question could have been avoided. On the argument of this case several of my brethren, who were then members of the court, have stated that this was the contested and turning point in that case; and so I should understand from the opinions delivered, which I have had the pleasure of perusing in manuscript. It is also said that the decision of that cause necessarily involved and affirmed the constitutionality of the general banking law. The question would have arisen incidentally if the point had been made; but members of this court on the argument of this cause have stated that such was not the case, neither party in that case denying that these institutions were legal bodies.

If, as this court held in the case of *Purdy* v. *The People*, the constitutional provision under consideration embraces all corporations, public and private, and if it be also true that the institutions organized under the general banking law are corporations, as was determined in *The Board of Supervisors of Niagara* v. *The People*, it is difficult to see how the case of *Warner* v. *Beers* can be sustained. It seems to me there is no escape from the charge of irreconcilable inconsistency in our decisions.

It is material also to consider that the case of *Warner* v. *Beers* is a single decision. For this reason I think the principle of *stare decisis* does not preclude the examination of the main question in this case. The decision stands alone, and is of a recent date. It is not sustained by a long current of adjudications, but on the contrary, is shaken by every judgment which has since been given where the question was in any way involved. If in addition to this it shall, on examination, be found not to be founded on principle, all the authorities concur that it cannot be sustained.

This brings me to the consideration of the great point, Is this law, which it is conceded did not receive the votes of two-thirds

of the members of the legislature, constitutional ? In order to decide this two other questions arise: Are these associations corporations? and if so, are they within the prohibitory clause? It would seem that these questions are already answered by the cases of *The Supervisors of Niagara* v. *The People*, and that of *Purdy* v. *The People*. But I will briefly examine the question, what is a corporation. We have a great many attempts to define the term. (*Kyd on Corp.* 12; 1 *Bl. Com.* 470; *Wordsworth on Joint Stock Co.*, 2; *McCullock's Com. Dic. Companies; Jacob's Law Dic. Corporatians; Ang. & Ames on Corp.* 1; *Bank of the U. S.* v. *Dandridge*, 12 *Wheat.* 64; *Runyan* v. *The Lessee of Coster*, 14 *Pet.* 122; 1 *Brown's Civil Law*, 99; *French's Com. Code, B.* 1, *tit.* 3; 1 *Lill. Abr.* 459; 1 *Bouvier's Law Dic. Body Politic*; 2 *Kent's Com.* 267; 4 *Wheat.* 518; 4 *Peters*, 562; *Glover's Law of Municipal Cor.* 3; 3 *Meriwether & Stephens on Corp.* 15, 20; 10 *Rep.* 23; 2 *Bulstrode*, 233; 1 *Tom. L. Dic.* 435, *Corp.; Hilliard's Elements of the Law*, 32; 2 *Bac. Abr.* 2, *Corp. A.;* 13 *Peters*, 519, 587; 2 *Cranch*, 127.) A brief but clear and comprehensive definition is given by Bronson, J. in *The People* v. *The Assessors of Watertown*, (1 *Hill*, 620,) as follows: "A corporation aggregate is a collection of individuals united in one body, under such a grant of privileges, as secures a succession of members without changing the identity of the body, and constitutes the members for the time being, one artificial person, or legal being, capable of transacting some kind of business like a natural person." A corporation, according to my understanding, is a franchise granted by government, by which the members merge their individual characters into one artificial legal existence. It seems to me that but two requisites are necessary, that it should be authorized by government, and that the members should be combined into an artificial unity. We are sometimes told that corporations must have perpetual succession, a right to sue and be sued, and to hold property, that they must have a common seal and power to make by-laws. Blackstone says, these are inseparably incident to corporations; and our statute is to the same effect. (1 *Bl. Com.* 475; 1 *R. S.* 599.) But these

attributes are merely incidental to a corporation as such. It is not essential to the existence of a corporation that it should possess them all. Even as to succession; why would not an authority to particular individuals named in the act to assume a corporate name and act as a corporation in certain business during their joint lives, be a corporation? As to the right to sue and be sued, have a seal, and make by-laws, it was decided more than two centuries ago, that these, if in the charter, were merely declaratory and were not necessary to create a corporation. (10 *Rep.* 32; 1 *Roll. Abr.* 513, *b.* 10; 3 *Rep.* 73; *Norris* v. *Staps, Hob.* 211; *Davenant* v. *Hurdis, Moor,* 564; 2 *Bac. Abr. Corp. D.;* 1 *Bl. Com.* 475.) Clearly no particular form of words is necessary to create a corporation. (10 *Rep.* 32; 3 *id.* 73; 2 *Danv. Abr.* 214; 1 *Roll. Abr.* 513, *b.* 10.) The case in 10 *Rep.* 30*b,* 31*a,* certainly seems to decide that a corporation may exist without all of these incidents. (*See also Allen* v. *Sewall,* 2 *Wend.* 327; 6 *id.* 348, *S. C. in error, per Walworth, Chan.*) I suppose that at the present day there can be no dispute in this country, but that the grant of a franchise must emanate from the government. Blackstone says that among the Romans a corporation could be formed by voluntary association; but this is denied in 1 *Brown's Civil Law,* 99. However this may be, it is now settled, that all voluntary associations are no more than partnerships. Our law knows but two classes of such associations; corporations and partnerships. Even authorized joint-stock companies in England are nothing more than partnerships. (*The King* v. *Dodd,* 9 *East,* 516; 3 *Ves. & B.* 180; *Wordsworth on Joint Stock Co.* 110; 9 *Barn. & Cress.* 401; 1 *id.* 74; *Keasley* v. *Codd,* 2 *Carr. & P.* 408, *note; Maudslay* v. *Le Blanc, id.* 409, *note; Coll. on Part.* 626, 651; *McCullock's Com. Dic. Companies.*)

I have no doubt but that a corporation may be shorn of some of the incidents, by the power giving it existence. Indeed, we have made the members of manufacturing corporations personally liable to a certain extent. And on the other hand, in England at least, powers can be given to partnerships which are similar to some of those said to be incidental to cor-

*Gifford v. Livingston.*

porations. (*Steward* v. *Greaves*, 10 *Mees. & Welsb.* 711; *Beech* v. *Eyre*, 5 *Mann & Gr.* 415.) The criterion is not, whether there are not certain powers and rights that are common to both; but the great distinctive feature of a corporation is, that it is authorized by a law or grant to act as an artificial being, the several members of which constitute one person in law, and have but a single will.

Having discussed the nature of corporations, we are led next to inquire whether associations under the general banking law are corporations. This court has at least once, and the supreme court has repeatedly declared that they are; and even the case of *Warner* v. *Beers* does not decide the contrary. Indeed, I understand that the learned chancellor could not in that case vote for the second resolution as first proposed, because it declared unqualifiedly that they were not corporations. Do they possess the attributes of corporations within the settled definitions of that term? To determine this requires an examination of the nature and powers of these institutions. They have their existence by an act of the government; the members are so combined as to lose their individual character, and they act solely as an artificial being; they have power to sue and be sued by an artificial name, and may use a common seal; they may appoint and remove officers, and can only act by those officers. The individuals cannot, as such, do any act to bind the association. A member may be sued at law by the association: the individual members are not liable for the debts of the association, and they hold their interest by transferable shares. There is perpetual succession, and immortality, by which I understand that the association is not affected by a change of members or the death of any number of them less than the whole. In short, every quality and power, express and incidental, that has ever been attributed to corporations, appear to be given by the legislature to these associations. One or two of these powers are not expressly mentioned in the statute, but we have seen that they are always implied. If, then, they come into existence as corporations do, and have all the powers and qualities of corporations, can they be denied that character because the

legislature has not called them corporations? The act does not declare that they shall not be corporations; and if it had, the essence of the thing could not be altered by an arbitrary change of name.

This brings me to the consideration of the question, whether, admitting these associations to be corporations, the act was constitutionally passed, it being conceded that it did not receive the assent of two-thirds of the members elected to each branch of the legislature. It is said that this law is not within this provision, because it is general and open to all, and therefore is not a grant of a franchise; and also, because the law itself does not " create " the corporation. There are now a large number of these corporations in existence which could not create themselves; for, as has been shown, a merely voluntary association is not a corporation. Whence then do they derive their existence? It is not material that a corporation does not instantly result from the legislative act; for almost every grant of a corporation requires a subscription for stock and other acts before a boby corporate comes into existence. The voluntary act of individuals, in conformity with the statute, is required to complete the corporation. " It is immediately by letters patent, a corporation *in abstracto.;* but not *in concreto,* till the naming of the master." (*Sutton's Hospital case,* 10 *Rep.* 23.) And the king, it is said, may even grant to the subject the power of erecting corporations. (*Bacon's Abr., Prerog.* 53; 10 *Rep.* 23; 1 *Bl. Com.* 474.) If the objection in question is well taken, how are our manufacturing, religious and other corporations created? These have been treated as corporations in this and all our courts. (19 *John. R.* 473; 1 *Hopk.* 304; 25 *Wend.* 665.) It seems to me it would be as correct to say, the Great First Cause creates nothing in our fields because means are used to aid nature in her productions.

Then, does the *generality* of the law take it out of the restrictive clause? We are told it is not a grant, because not a monopoly. The clause reads, " any body politic or corporate;" not " any monopoly." The meaning of the words used is entirely clear and unequivocal. Manufacturing companies, reli-

gious and medical societies, public libraries, the university and limited partnerships, have been referred to in support of the position under consideration. As to all these, except limited partnerships, the acts under which they derive their existence were in force when our present constitution was adopted, and were preserved by the provisions of the thirteenth section of the seventh article of the constitution. And as to limited partnerships, though the law was not passed till April, 1822, and after the prohibitory clause took effect, yet if I am right as to the distinctive features of a corporation, they are not obnoxious at all to the clause in question. But if they were so, one violation of the constitution will by no means warrant another.

Various rules have been laid down for the interpretation of our constitutions. We are told that we must look to the history of the times and examine the state of things existing when they were formed and adopted. (*Baldwin, J. in the State of Rhode Island* v. *The State of Massachusetts*, 12 *Pet.* 723.) The *ex post facto* clause is mentioned as an illustration. There is no doubt but that the use of technical words should receive the accepted and practical meaning contemporary with their use in the instrument. So, too, we may look at the general history of the country and the state of things at that period, to find what the people understood by the expressions used. But with great deference, I object to limiting their supposed views to the consideration of any temporary existing evil, when adopting a phraseology perfectly plain, and which they intended should be the language of the organic law in all time. Their views might well extend beyond any present grievance; and no one has a right to enlarge or restrict the sense of words having a distinct meaning, because of some temporary influence which it is conjectured may have induced their adoption. We should read them as they intended succeeding generations should read them according to their plain import, and the then use of the language employed. This language cannot be limited, because it may happen to be in derogation of the common law : for it is paramount to all former laws and customs. It is better too, and the only safe way, at all times, to be careful to add nothing to the powers con-

ferred by the constitution. Any other rule leaves our rights to the caprice and prejudice, if not to the corruption, of each successive expounder.

We find no analogy to our political institutions in the systems of other nations. In England there is no written constitution. The celebrated *magna carta* is at the mercy of parliament, and has been already modified. There, in the language of Wilson, J., (2 *Dall.* 462,) "from legal contemplation, the people totally disappear." Parliament is omnipotent, and it would seem may declare a corporation a partnership, and a partnership a corporation, and perhaps an animal a vegetable. According to Blackstone, the "*jura summi imperii*" resides in parliament. (1 *Com.* 49.) Its legislative power "is the highest authority which the kingdom acknowledges on earth." (*Dwarris on Stat.* 668; 1 *Bl. Com.* 185.) But with us the case is entirely different. We have written constitutions, in which, to use the apt language of Patterson, J. in *Van Horne's lessee* v. *Dorrance*, (2 *Dall.* 308,) "the forms of government are delineated by the mighty hand of the people, in which certain principles of fundamental law are established." "The constitution is the work and will of the people themselves in their original sovereign and unlimited capacity. Laws are the work or will of the legislature in their derivative and subordinate capacity. The one is the work of the creator, the other of the creature. The constitution fixes limits to the exercise of legislative authority, and prescribes the orbit within which it must move." These doctrines appear to me to be sound. With us "legislation is (*not*) the greatest act of superiority one being can exercise over another;" and "sovereignty and legislation are" *not* "convertible terms," as in England. (1 *Bl. Com.* 49.) Our people have delegated certain powers of sovereignty to the legislature to be exercised strictly according to the written constitution; and any act exceeding that authority is void. The legislature cannot "mould and model the exercise of its powers" irrespective of the constitution. (*Story, J.* 4 *Wheat.* 304.) The remainder of the "*jura summi imperii,*" lies dormant in the people until they shall see fit further to exercise it. (*Chipman's Principles of Government*, 181.)

Gifford v. Livingston.

In the matter then before us, what is the result of the application of these principles? In the language of McLean, J. (11 *Pet.* 318,) " here is an act inhibited in terms so plain that they cannot be mistaken. They are susceptible of but one construction ;" and that cannot be done indirectly which cannot be done directly. To attempt this would be a fraud upon the people. With these views of the unyielding nature of our constitution, I cannot consent to lend my aid to any construction that I think violates its plain provisions. Indeed if we were ".to lock at the history of the times," probably excessive banking would be found to be one of the grievances of the day. And it is a little remarkable that 'although our national constitution is an enumeration of certain powers, given for certain specified objects, expressly reserving what is not granted, and does not in terms contain any authority to create a bank or other corporation ; and our own constitution prohibits the creating of a corporation unless by a two-thirds vote, yet one is made by judicial construction to warrant the creation of a banking corporation, and the other to authorize the organization of an unlimited number of the like institutions without a two-thirds vote.

After a most careful examination of this subject, I am convinced that the associations authorized by this act are " bodies politic or corporate," and clearly within the restrictive clause of the constitution. My mind, is forced to the irresistible conclusion that the general banking law is unconstitutional, and I shall therefore vote for the affirmance of the judgment of the supreme court.

Senators LESTER and WRIGHT also delivered written opinions in favor of affirmance.

On the question being put, "Shall this judgment be reversed?" the members of the court voted as follows :

*For reversal :* The PRESIDENT, The CHANCELLOR, and *Senators* BACKUS, BARLOW, BEERS, BOCKEE, BURNHAM,

DEYO, EMMONS, FOLSOM, HARD, JONES, LOTT, PORTER and SEDGWICK—15.

*For affirmance :* Senators HAND, LESTER, SCOVIL, SMITH, TALCOTT, VARNEY, WRIGHT—7.

The following resolution was then offered for adoption :

*Resolved*, That the judgment of the supreme court is reversed on the ground that the decision of this court in the case of *Warner* v. *Beers*, decided that the law entitled " an act to authorize the business of banking," passed April 18, 1838, is valid and was constitutionally enacted, although it may not have received the assent of two-thirds of the members elected to each branch of the legislature ; and that the decision in that case is conclusive.

On the question being put on adopting the said resolution, the members of the court present and voting voted as follows : *In the affirmative :* The PRESIDENT, The CHANCELLOR, and *Senators* BACKUS, BARLOW, BEERS, BOCKEE, BURNHAM, DEYO, EMMONS, FOLSOM, HARD, PORTER and SEDGWICK—13. *In the negative :* Senator SCOVIL. The resolution was accordingly adopted.

**Judgment reversed.**