Bronson, J.
The charter granted by Governor Montgomerie to the city of New-York, of the 15th January, 1730, authorized the aldermen of the city, with certain other officers, to hold and keep courts of general sessions of the peace in and for the city and county of New-York; and in pursuance of that charter, and several legislative enactments passed since that time, the aldermen have sat in the courts of general sessions of the peace in New-York for the last one hundred and ten years. On the 14th of May, 1840, an act was passed “for the better organization of the criminal courts in the city and county of New-York,” the first section of which was in the following words—“ The court of general sessions in the city and county of New-York shall hereafter be held, and all the powers thereof exercised, by the recorder of the city of New-York and two judges to be appointed by the governor and senate, who shall be called and known as the associate judges of the court of general sessions of the city and county of New-York.” (Stat. 1840, p. 257, § 1.) The 14th section repeals certain provisions of the revised statutes, a single section of the act of 1833, and all other acls and parts of ads inconsistent with the provisions of the law of 1840. This repealing clause is confined to legislative enactments, and is not broad enough to reach the charter of 1730. But the first section necessarily excludes the aldermen from the court of general sessions, and this indirectly reaches and annuls a portion of the charter. The language of the section is, that the court “ shall hereafter be held and all the powers thereof exercised,” hy the recorder and two judges to be appointed by the governor and senate. This language is, I think, broad enough to work a repeal, hy implication, of that clause in the charter of 1730 which authorizes the aldermen to sit in the court of general sessions.
*33 The power of the legislature to alter the charters of public corporations without their consent—provided rights of property are not affected—cannot be doubted. Cities and villages exercise certain powers of government—a portion of the sovereign power of the state—within a limited district. Such privileges cannot, from their very nature, be the subject of an inalienable grant. They may be recalled at pleasure. Whether the act of 1840 was a wise or politic exercise of the legislative power, is a question with which we have nothing to do.
The legislature has the same power over corporations created by royal charter prior to the revolution, that it has.over corporations created by the legislature since that time. The constitution gives no new force to grants made by the kings of Great Britain, whether of lands or of corporate franchises. It merely provides, that those grants should not be affected or annulled by the revolution, and the new fundamental law of the state. (Const. 1777, § 36. 1821, art. 7, § 14.) I do not suppose that this provision was at all necessary. It seems to have been adopted, originally, for more abundant caution, and to quiet the apprehensions of those who were possessed of lands or corporate privileges, held under authority of the British crown; and it was continued in the constitution of 1821, for the purpose of avoiding any implication against the validity of those grants which might arise from the omission of the clause in the new fundamental law. But, whether the provision was a necessary one or not, it goes no further than to declare, that nothing contained in the constitution “ shall annul any charters to bodies politic and corporate and cannot be construed as giving any new sanction to those grants, or limiting in any degree the power of the legislature over them.
But it is said that the act of 1840 did not receive the assent of two-thirds of the members elected to each branch of the legislature, and consequently that it is not a valid law. (Const, art. 7, § 9.) The fact that it did not have the votes of two-thirds of the members, was conceded by the *34 attorney general on the argument; and we see from the Journals that only one half of the senators, and less than half of the members elected to the assembly, voted for the bill on its final passage. (Senate Jour. 1840, p. 123, 4. Assembly Jour. 1840, p. 1466.) How a question like this shall be tried, or whether it can be tried at all, when a bill has gone through all the usual forms of legislation, are questions which were not considered in the case of Thomas v. Dakin, (22 Wend. 9.) They are now presented to this court for the first time.
It has not been denied that the judicial tribunals of the state may, in some way, look beyond the printed statute hook, for the purpose of ascertaining whether bills coming within the two-thirds clause of the constitution have received the requisite number of votes: and although I have felt a good deal of difficulty on that question, I am inclined to the opinion that such an inquiry may be instituted. The question is no doubt one of great delicacy; but if the courts have the right to entertain it, the duty is imperative, and we are not at liberty to shrink from its performance. We live under a government of laws, reaching as well to the legislative as to the other branches of the government; and if we wish to uphold and perpetuate free institutions, we must maintain a vigilant watch against all. encroachments of power, whether arising from mistake or design, and from whatever source they may proceed. The constitution is explicit in its terms, and in a particular class of cases upon which the legislature may act, it denies to a bare majority of members the power which in other cases they undeniably possess. To give efficiency to this provision, and secure the people against the exercise of powers which they have not granted, we must, I think, when called on to do so, look beyond the printed statute hook, and inquire whether bills creating or altering corporations have received the requisite number of votes.
Statute laws may be read in evidence, either from the state paper, or from the volumes published by the state printer. (1 R. S. 183, 184, § 8, 12.) It is also ehacted, *35 that “no bill shall be deemed to have been passed by the assent of two-thirds of the members elected to each house, unless so certified by the presiding officer of each house.” (1 R. S. 156, § 3.) To give full effect to this enactment, and provide a convenient mode of ascertaining whether the two thirds clause in the constitution has been duly observed, the laws should be published with all the usual evidences of their authenticity. The certificates of the presiding officers of the two houses, and the approval of the governor, should be published, as well as the body of the law. But as such has not been the practice, I have examined the original engrossed bill on file in the secretary’s office, and find that the act of 1840 is only certified by the presiding officers in the usual form of certifying majority bills. If this be not conclusive, it is at least prima facie evidence; and, following the statute, this bill cannot be “ deemed to have been -passed by the assent of two-thirds of the members elected to each house.” '
This brings us to the question, whether the act of 1840 is such an one as required a two-thirds vote. That the city of New-York is a body politic and corporate, and that the act of 1840, if duly passed, alters the charter, are propositions which • have not been, and cannot be denied. But it is said, that the constitution does not extend to public corporations, and therefore a majority vote was sufficient. I do not so read the constitution. The language of the clause is, “ the assent of two-thirds of the members elected to each branch of the legislature, shall be requisite to every bill creating, continuing, altering or renewing, any body politic or corporate.” These words are as broad in their signification as any which could have been selected for the occasion from our vocabulary; and there is not, a syllable in the whole instrument tending in the slightest degree to limit or qualify the universality of the language. If the clause can be so construed that it shall not extend alike to all corporations, whether public or private, it may then, I think, be set down as an established fact, that the English language is too poor for the framing of fundamental laws *36 which shall limit the powers of the legislative branch of the government.
No one has, I believe, pretended that the constitution, looking at that alone, can be restricted to any particular class or description of corporations. But it is said, that we may look beyond the instrument for the purpose of ascertaining the mischief against which the clause was directed, and thus restrict its operation. But who shall tell us what that mischief was ? Although most men in public life are old enough to remember the time when the constitution was framed and adopted, they are not agreed concerning the particular evils against which this clause was directed. Some suppose the clause was intended to guard against legislative corruption, and others that it was aimed -at monopolies. Some are of opinion that it only extends to private, without touching public corporations; while others suppose that it only restricts the power of the legislature when creating a single corporation, and not when they are made by the hundred. In this way a solemn instrument, for so I think the constitution should be considered, is made to mean one thing by one man, .and something else by another, until in the end it is in danger of being rendered a mere dead letter; and that, "too, where the language is so plain and explicit that it is impossible to make it mean more than one thing, unless we first lose sight of the instrument itself and allow ourselves to roam at large in the boundless field of speculation. For one, I dare not venture' upon such a course. Written constitutions of government will soon come to be regarded as of little value, if their injunctions may be thus lightly overlooked; and the experiment of setting a boundary to power, will prove a failure.
We are, not at liberty to presume that the framers of the constitution, or the people who adopted it, did not understand the force of language. They knew that we already had both public and private corporations, and that others of both kinds would afterwards be wanted. And when they declared, that the assent of two-thirds of the members should be requisite to every bill creating or altering wiy *37 body politic or corporate, they could have intended nothing less than that the provision should extend alike to all. It is very.likely that they thought some corporations more injurious, or, at least, of more questionable utility than others. But they did not attempt to specify or describe, but used the most general and comprehensive language. The only just infeemce to be drawn from such premises is, that the provision was made thus broad for the very purpose of preventing its being frittered away by interpretations and constructions. By including all, they evidently intended that one class of corporations should not escape through a saving clause intended for another.
It is, I think, fair to presume, that the framers of the constitution when they employed this general language, reasoned somewhat in this way—“If public corporations, or corporate bodies of any other kind, ought to be created almost as a matter of course, and if they do not seek to obtain any questionable powers, there will" then be no difficulty in obtaining a two-thirds vote; and consequently no harm can be done by making the provision broad enough to include all.”
But we are not left to conjecture on this subject. When this clause came up for consideration in the convention, the very objection was taken to it, that it extended to public as well as private corporations; and it was proposed to amend by inserting after the word “ any,” the words “ bank or moneyed institution in this state”—thus limiting it to a particu’ar class of corporations. Mr. Radcliff prefaced the amendment by the remark, that as the clause stood it would “ require two-thirds of the legislature to incorporate a village, bridge or turnpike.” To which it was answered, that “ two-thirds would never be wanting to incorporate a village or a turnpikeand thereupon the amendment was withdrawn, and the original proposition adopted by unanimous consent. (Carter & Stone, Debates in Conv. p. 446.) We have here the most unequivocal proof-evidence which no man can fail to see, wink as hard as he will—that the framers of the constitution meant precisely what they said. *38 While it was conceded that some corporations were more objectionable than others, they made the provision general; and this was done, to the end that the clause might most certainly reach those of doubtful utility. While they agreed, and that, too, unanimously, that the clause extended to public, as well as private corporations, they refused to except any, because such as ought to be created would find no difficulty in obtaining the requisite number of votes.
We have here not only the unequivocal language of the constitution itself, but the declared will of the framers of that instrument in another form, both forbidding us to except public, or any other corporations, from the influence of the clause; and this fundamental law has not yet been repealed, unless it has been brought about without the consent of the people who adopted it. I rvill not inquire whether the provision be a good or a bad one. Whatever may be my views on that subject, I am not at liberty to set up my opinion against the declared will of the people as manifested in the supreme law of the land. If we may get round ■this clause of the constitution because it stands in our way, or we do not like it, we may in the same manner get round any other clause in that instrument; and thus all hope of fixing the boundaries of power by written constitutions, will be at an end.
It is said, this court has decided that the clause in question does not extend to public corporations. If the remark were well founded, it would be far from being conclusive. When it isf considered that a vast amount, of business is constantly pressing upon the judges, it can be no matter of astonishment that they should sometimes fall into error. If they have made a mistake upon this or. any other question, it should not be regarded as a fatal error. The decision may not only be reviewed in another forum, but the judges will, I trust, always be ready to reconsider and retrace their steps when they find themselves occupying untenable ground.
But this court • has never decided that the constitution *39 did not extend to public corporations. Although one of the judges has intimated such an opinion, it was not necessarily-involved in the case under consideration; and I need hardly say, that neither the court, nor the judge who delivers the opinion, is responsible for any thing more than the conclusion at which he arrives. The case to which we are referred is The People v. Morris, (13 Wendell, 325.) Now, in the first place, it did not appear in that case, nor did the court in any way inform itself, that the revised statutes, which prohibit grocers from selling spirituous liquors to be drank on their premises, had not been passed by a two-thirds vote. So far as then appeared, or as we are now informed, the statute had as many votes as would be necessary to create or alter a body corporate of any kind whatever. In the next place, the statute then in question did not touch the village of Ogdensburgh alone, or any other corporation in particular. On the contrary, it was a general statute, regulating the internal police of the state; and, with a single exception, it extended alike to every city, town and village, and every citizen within our limits. Corporate privileges were only touched incidentally, in the same way that tax laws and other general statutes reach all persons, whether natural or artificial. This was the reason primarily assigned by the present chief justice for the judgment which was rendered in that case; and it was wholly unnecessary to go further and enquire whether the constitution extended to public corporations.
The difference between a general excise law extending alike to the whole state, and a law touching the charter of a single city, is too manifest to require any illustration.
Legislative precedents have been referred to in support of the position that the constitution does not extend to public corporations. Although these may not always furnish the most safe guide on a question of this kind, I do not regret that legislative precedents have been mentioned; for if I am not greatly mistaken it will be found, that, with one or two exceptions occurring in 1840, there is an *40 unbroken current of legislative authority against the doctrine in question, from the adoption of the constitution down to the present day. Since the first day of March, 1822, when the two-thirds clause in the constitution took effect, some hundreds of statutes creating or altering the charters of public corporations have been passed ; and with the exception already suggested, I hazard little in saying, that not one of those statutes has been passed without a two-thirds vote in both houses. I cannot now Oommand the time to search the journals nor look into the secretary’s office, but as an attentive observer of the course of legislation for the last nineteen years, I feel great confidence that the remark already made will turn out to be well founded. Down to the time that the case of The People v. Morris was decided, it was never, I think, even suggested in the legislature that a two-thirds vote was not necessary to create or alter a public corporation; and since that time, although the point has been repeatedly made, it has as often been decided against the doctrine now set up. I will mention one precedent, because the state paper of the first of March last, in which it may be found, happens to lie before me. The speaker of the present house of assembly decided, that a bill to amend the charter of the milage of Oswego required the assent of two-thirds of all the members elected, for its passage; and he said, this was in accordance with the whole current of decisions since the adoption of the constitution. On appeal, the case of The People v. Morris was cited, and after the whole matter had been debated at large, the decision of the speaker was sustained by a vote of 89 to 13—nearly seven to one. I mention the numbers for the purpose of showing that it was not a political division, for decisions of that kind are entitled to no great weight in courts Of justice; These legislative precedents are entitled to the more consideration from the fact, that they are disclaimers of power, such as public bodies do not usually make where there is any fair and reasonable ground for maintaining their authority. *41 The revised statutes declare, that “each town, as a body corporate, has capacity to sue and be sued,” &c., and the same language is employed in relation to counties. (1 R. S. 337, 364.) Now until it appears that these laws were not passed by a two-thirds vote, a fact that I never heard suggested, they obviously prove nothing to the present purpose. But again; although towns and counties have certain capacities “as” or like “a body corporate,” they are only quasi corporations. They are not those artificial persons which either lawyers or laymen call corporations. The trustees of gospel and school lots, and the superintendents of the poor are also spoken of as corporations. (1 R. S. 498, 617.) But although they have certain corporate capacities, they are not corporations in the proper sense of the term. They have some of the attributes of a corporation, and so have the commissioners of the canal fund, and of the land office, the canal board, the board of canal commissioners, the commissioners of highways in towns, and trustees of school districts ; but they are not corporations proper. And here I will repeat the remark already made in relation to towns and counties, that it does not appear, nor have I ever heard it suggested, that the statutes relating to the trustees of gospel and school lots, and the superintendents of the poor, were not passed by two-thirds votes. Until that fact appears, it is impossible to use these enactments as legislative precedents in favor of the doctrine that the constitution does not extend to public corporations.
We have, then, in this case, first, the constitution itself, so explicit in its terms that the wit of man cannot so construe it but that it will- extend to public as well as private corporations : second, the declared intention of the framers of that instrument, manifested in another form, to include all corporations, and a refusal on their part to make a restricted provision: and third, with only one or two exceptions, an unbroken current of legislative authority from the adoption of the constitution down to the present day, in support of the position that the clause in question extends to public *42 as well as private corporations. Surely, this should be enough to settle the question.
The enquiry whether the constitution extends to all corporations, happens to be presented for the first time in a case of no great public interest. For aught I know, the law excluding the aldermen from the court of general sessions may be a good one. But that cannot alter the principle involved in the case, which is one of more than ordinary importance. If the legislature can limit the powers of a public corporation by a majority vote, they may also enlarge those powers, or make an original creation, by the like vote; for “ creating, continuing, altering” and “ renewing,” all stand on the same footing in the constitution. Although the claim of the aider-men may” be one of no great moment, I deem it vastly important that the constitution should be so read and upheld that the people will have no just cause to apprehend that the fundamental law is lightly regarded by those to whom they have committed important public trusts.
I do not see how we can avoid passing upon the constitutional question. Whether the power to hold courts ought ever to be conferred upon corporation officers is not the proper enquiry. It was expressly granted by the charter of 1730, and was conferred on the corporation by name as a part of its franchise.(a) It is as much a part of the chartered privileges of the city as is the power granted by the same charter to establish markets, make by-laws, and regulate the internal police of the city. How the power of the aldermen can be taken away without altering the *43 charter I am unable to comprehend. If the act of 1840 does not exclude the aldermen from the courts of general sessions, there has then been no usurpation, and the defendant is entitled to judgment on that- ground. If the act of 1840 does exclude the aldermen, it is because it alters the charter of the city under which they hold their seats in the courts of general sessions ; and then as the act did not receive the requisite number of votes, it is void, and the defendant is entitled to judgment upon that ground.
In my opinion, this information is not well grounded. But my brethren, while they agree with me on most of the questions which have been considered, have arrived at a different conclusion.
Cowen, J.
I have thought a good deal upon the question of legislative power discussed by Mr. Justice Bronson, and perceive difficulties in it, which I had not anticipated before I heard his opinion. Were I clear that the power of Alderman Purdy to sit as a judge in the court of general sessions might be considered strictly a corporate right within Art. 7, § 9, of the constitution, whether such right were public or private, I might require still farther time, or perhaps assent at once to the conclusion that the act of 1840 did not affect his power for want of a two-third vote. Such a vote is required for altering any body politic or corporate. And if the act had sought to abolish the office of alderman, or diminish his power as such, I need not say, after the opinion I have heard, that there would be strong reasons for considering the act a nullity. Under such a view of the question, I should feel much embarrassed by the conflicting state of opinion in this court and elsewhere. But here is no attempt by statute to abolish the office of alderman, or diminish his power. The board of aldermen are an integral part of the corporation, (Session Laws of 1830, p. 125,) having, as such, certain legislative, executive, and, it may be admitted, though this is doubtful, certain judicial powers. By the charter or an act of the legislature, it was also thought proper to confer, not on the *44 board, but the aldermen as individual officers, the power to act as judges of the general sessions of the peace, (2 R. S. 145, 2d ed. § 42;) a court having, in its ,own nature, no connection with the corporation, and the power of the court itself not being a corporate power, or any thing like it. This is the power which the act of 1840, (Sess. Laws of 1840, p. 257, § 1,) has taken away. The case is the same as if the legislature had first declared that the aldermen for the time being should be vice chancellors; or should compose an inferior court of equity; and then, after an election had intervened, another statute had abolished their chancery powers, and transferred them to three gentlemen of the city to be appointed by the governor and senate. My opinion is, that the latter statute would not be the altering of a body politic or corporate, within the language or meaning of the two-third clause in the constitution. The whole would be but the conferring and taking away of the power to hold a court of justice. It is no more a corporate power, because annexed to persons designated as holding the office of aldermen, than if they had been called by their proper names.
In this view, the passing of the act of 1840 was not an attempt to alter a body politic or corporate; but the exercise of another legislative power entirely distinct—the power to take jurisdiction away from one court and transfer it to another. This, I am of opinion, can always be done by a majority vote, though the judges from whom the power is taken may be designated by the same title as they are known by when mentioned as an integral part of a corporation. In short, the statute does not attempt any action upon corporate power.
I am of opinion that judgment of ouster should be rendered against the defendant.
The Chief Justice was of the same opinion, for the reasons expressed in The People v. Morris, (13 Wend. 325.)
Judgment for the people.

 Sec. 26. “ And further, we, of our special grace, certain knowledge, and meer motion, have given, granted, ratified and confirmed, and by these presents do, for us, our heirs and successors, give, grant, ratify and confirm unto the said mayor, aldermen and commonalty of the city of New-York, and to their successors forever,” “ that they, the said mayor, deputy mayor, recorder and aldermen of the said city, for the time being, or any four or more of them, (whereof we will the mayor, or deputy mayor, or recorder of the said city for the time being to be one,) shall and may forever hereafter hold and keep four courts of general sessions of the peace in and for the said city and county of New-York, to begin,” &e.