[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 131 
Section 1, chapter 672, Laws of 1867, enacts that it shall be lawful for the supervisor of any town in the county of Chautauqua, through which the Dunkirk, etc. *Page 132 
railroad shall run, or of any town adjoining either of the towns through which said railroad shall run, to borrow, on the faith or credit of such town, any sum of money, not exceeding twenty per cent of the assessed valuation of the real and personal property of such town, as shown by the last assessment roll previous to the issuing of the bonds authorized by the act, at a rate of interest not exceeding seven percent, and for a period not exceeding thirty years, and to execute bonds therefor; provided that the power and authority conferred shall only be exercised upon the condition that the consent shall first be obtained in writing of a majority of the tax-payers of such town owning or representing, etc., more than one-half of the taxable property of said town, assessed and appearing upon the assessment roll of the year last preceding the issuing of the bonds authorized, proved or acknowledged as therein specified; and that such consent shall be procured within three years from the passage of the act. That such consent shall state the amount of money to be raised, and the fact that a majority of the tax-payers owning or representing a majority of the taxable property, as appeared from the assessment roll, had been obtained, should be proved by the affidavit of one of the assessors of the town, or that of the town or county clerk, indorsed upon or annexed to such written consent, which should be filed, and have the effect specified in said section.
Section two provides that said supervisor may, in his discretion, dispose of such bonds or any part thereof to such persons and upon such terms, not less than par, as he may deem most advantageous to the town; and that the money raised by loan or sale of the bonds shall be invested in the stock of the railroad company; and that the same shall be used in the construction of the railroad, etc.; the public necessity and utility of which was thereby declared; and that in its construction the said towns were immediately interested; and that for the purpose of such construction the said supervisor, in the name of the town, might subscribe for and purchase the stock of said *Page 133 
company to the amount to which the tax-payers had consented, as above specified; and that by virtue of such subscription and purchase the town should acquire all the rights and privileges, and incur all the responsibilities as other stockholders of the company. Other sections provide for levying and collecting taxes for the payment of the interest and principal of the bonds to be issued, and other matters not material to the questions in this case.
Between the passage of the above act and before the passage of chapter 472 (volume 1, page 850, Laws of 1868), the town of Stockton was not bonded. By the first section of the last mentioned act it was provided that, in case the written consent of the taxpayers of any town has been or should thereafter be obtained in the manner provided by the first mentioned act, its supervisor was authorized and required to make a subscription to the stock of the company to the amount fixed in such consent, and to issue the bonds of the town, and dispose of the same as required by said first mentioned act. Section three of the last act provides that the supervisor of Stockton shall not be required to issue the bonds of that town, although authorized as required by the act of 1867, until the iron was laid upon the road from Dunkirk to the Pennsylvania line.
The following consent of tax-payers was introduced in evidence upon the trial: "The undersigned, tax-payers of the town of Stockton, hereby consent that the supervisor of the town of Stockton may borrow the sum of $34,000 on the faith and credit of said town, at a rate of interest not exceeding seven per cent, for a term not exceeding thirty years, and execute bonds therefor under his hand and seal; and that the said supervisor may, in his discretion, dispose of such bonds or any part thereof; and that the proceeds of the sale of such bonds shall be invested in the stock of the Dunkirk, etc., railroad company; and that the said supervisor may exercise full and complete powers for said town under the first mentioned act." This consent was signed by a considerable number of tax-payers, whose signatures were proved or acknowledged as required by the act, to which was annexed an affidavit *Page 134 
of Corydon Putnam, one of the assessors of the town, to the effect "that the persons whose names appear attached to said consent, and which appear on the assessment roll of the town for the year 1867, were a majority of all the tax-payers of the town of Stockton whose names appear upon said assessment roll, and that they are a majority of all the tax-payers in said town of Stockton whose names appear upon the assessment roll for the year 1867, including resident tax-payers, owners of non-resident lands, and including agents representing owners of taxable property; and that each person, so signing said consent, has in due form acknowledged the same or his signature been proved in due form of law." This affidavit was sworn to November 21, 1867; but the papers were not filed in the town clerk's office until April 25, 1868.
No further steps to bond the town appear to have been taken until after the passage of chapter 282, Laws of 1870, volume 1, 634. Section two of this act provides that in any case where the written consent authorizing the supervisor of any town to subscribe to the stock of the Dunkirk, etc., railroad company shall have been filed in the town clerk's office of the town, and a copy thereof in the county clerk's office of the county, with the affidavit of one of the assessors of the town, etc., indorsed or annexed to such written consent, and such affidavit shall be based upon the assessment roll of such towns for either of the years 1867, 1868 or 1869, or for the last year previous to the issuing of the bonds as authorized, such affidavit shall be evidence in all courts and for all purposes, and such consent shall authorize, uphold and require the respective subscriptions to be made to such stock, and authorize, uphold and require the issue of bonds to the amount specified in such consent for such towns respectively, and such bonds shall bear date and interest from the respective dates of the first filing of said copy of consent and affidavit in the Chautauqua county clerk's office, and no clerical or other defects in any of such affidavits shall invalidate such proof, or the subscription to the stock or the said *Page 135 
bonds. Section three provides that if the said bonds when issued shall not be sold for money, as required by the original act, within thirty days from the time when they are ready for sale, the supervisor of the town issuing the same shall deliver said bonds to the railroad company, receiving therefor the par value of the principal of said bonds in the stock of the company at its par value. Section four repeals section three of the act of 1868, which provided that the supervisor of Stockton should not be required to issue the bonds of the town until the iron was laid on the road from Dunkirk to the Pennsylvania line. The act of 1867 was a mere enabling act, conferring power upon the several towns embraced therein to issue bonds, upon the conditions therein specified, to aid the construction of the railroad, etc. It conferred no right upon the railroad company or any one else, when proceedings for bonding had been commenced, to have any further steps taken until bonds had been actually issued under the act. Then such rights were acquired. The railroad company could then enforce the application of the proceeds to the construction of its road according to its provisions, assuming the act to be constitutional. The consent of the tax-payers was given under this act. The entire language of the consent shows that the signers understood the act, and their consent in conferring discretionary power upon the supervisor to act upon his views as to the interest of the town. They consent that he may borrow the sum of $34,000, upon the faith and credit of the town, etc., and execute bonds therefor. That he may, in his discretion, dispose of such bonds or any part thereof, and invest the proceeds in the stock of the railroad company, and that he may exercise full and complete powers for said town, under the act. Sometimes the word "may" is construed as "shall," but only when the context shows that such was the intention, or when the public have an interest in the exercise of the powers so conferred upon officers or official boards or tribunals. The import of the word, as used in the consent and the act, is to give power, license and permission, not to require or enforce the performance of any one *Page 136 
of the specified acts. This view is confirmed by the different language of the acts of 1868 and 1870, relating to the same subject, the latter showing an intention to compel the supervisor to bond the town, and if he failed to sell the bonds at par, within thirty days after they were ready for sale, he is not only authorized but required to deliver the bonds to the railroad company, upon receipt from it of an amount of stock equal to the principal of such bonds. Under the act of 1867, care was taken that the bonds should not be issued for less than the par value, in cash. This would be the result, whether the money was borrowed upon the faith and credit of the town, and the bonds given as security, or the bonds sold at not less than par. Thus there would, in case the town was bonded, be secured for the construction of the road, cash equal to the principal of the bonds. If the bonds are delivered to the company upon the receipt of stock, to an amount equal to the principal of the bonds pursuant to the act of 1870, the bonds become the property of the railroad company, and may be sold upon the market much below par, and thus much less money accrue therefrom for the construction of the road. It is obvious that the consent given does not embrace any such transaction.
Again, the act of 1867 requires that the consent shall be based upon the assessment roll of the year last previous to the issuing of the bonds. This is entirely departed from in the act of 1870. Had there been no subsequent legislation it is clear that no bonds could have been issued upon the consent given and affidavit made after the completion of the roll of 1868. Had bonds been issued under the provisions of the act of 1867, and the town had complied with its provisions, it would not have been liable to pay a tax at any one time to pay more than one year's interest upon the bonds, as none would have accrued prior to the issue; while the act of 1870 requires in effect that they should bear date and be upon interest from April 25th, 1868, the time of filing the consent and affidavit in the town clerk's office, thus subjecting the town to a tax for this back interest, *Page 137 
in addition to such as should accrue after the issue. No tax-payer of the town has ever consented to any such issue of its bonds. The judgment awards a mandamus to the appellant compelling him to issue bonds according to the requirements of the act of 1870. If the consent of the tax-payers or any part of them, or of any of the town boards or officers or any of the electors of the town is necessary, this judgment cannot be sustained, as no such consent has been given to such an issue of bonds as the judgment commands.
But before examining this question it may be well to consider the point made by the counsel for the respondent: that the appellant having made a return to the alternative writ, and issue having been taken upon such return by the relator, and a verdict having been found in his favor, he is entitled to judgment thereon awarding a peremptory mandamus, together with damages and costs, of course, and therefore the question whether any of the acts in question are constitutional cannot be raised by the appellant either in this or the Supreme Court. 2 R.S., 587, § 57, cited by counsel, provides that in case a verdict shall be found for the person suing out such writ, or if judgment be given for him upon demurrer or by default, he shall recover damages and costs in like manner as he might have done in an action on the case as aforesaid, and a peremptory mandamus shall be granted to him without delay. The common law providing and regulating the remedy by mandamus, will show that the purpose of enacting this and other provisions of this statute, and that of 9 Anne, chapter 20, was to authorize such pleadings in the proceeding as would present to the court the real merits for adjudication, instead of compelling the relator to resort to an action on the case for the recovery of damages, and to obtain a peremptory writ in case of a false return to the alternative writ. A review of the common law and the reasons for the passage of the statute will be found in the opinion of MARVIN, J., in the People v. The Supervisors ofRichmond Co. (28 N.Y., 112). This shows that it was the intention of the statute to do complete justice in the proceeding itself without *Page 138 
a resort to any other. The People v. The Bd. Metropolitan Police
(26 N.Y., 316) was decided upon a point not affecting the present question, and while the opinion of WRIGHT, J., seems to sustain the position of the counsel, he does not place his judgment upon that ground. It could not have been intended by the statute to give a peremptory writ where the record showed no legal right because of a mistake in the return in matters of fact resulting in a verdict for the relator. The Commercial Bank of Albany v.The Canal Commr's (10 Wend., 25) gives the true rule: "That at any time after a return, and before a peremptory mandamus is awarded, the defendant may object to a want of sufficient title in the relator to the relief sought or show any other defect of substance, though he cannot after return object to defects in form." If the law gave an absolute right to the writ where a verdict was found for the relator, although from the entire record it appeared he had no such right, great injustice might be the result.
This brings us to the question whether a mandatory statute compelling a town or other municipal corporation to become a stockholder in a railroad or other corporation by exchanging its bonds for stock upon the terms prescribed by the statute, without its consent in any way given, is constitutional. This is a different question from that decided by this court in The Bankof Rome v. The Village of Rome (18 N.Y., 38) and in subsequent cases. In these the question was, whether enabling statutes conferring power upon such corporations to contract debts with their own consent and investing the money thus raised in the stock of railroad corporations or of exchanging directly its bonds for such stock were valid. These acts were held constitutional by this court, but this does not determine that municipal corporations may be compelled by the mere authority of the legislature to enter into this class of contracts and become such stockholders without their consent and against their will. In The People v. Flagg (46 N.Y., 401) it was held that an act requiring the town of Yonkers without its consent to issue *Page 139 
bonds for raising money, which was to be expended in the construction of highways in the town, in the manner prescribed by the act, was constitutional. This was so determined, upon the ground that the making and improving of public highways and providing the means therefor were appropriate subjects of legislation; that towns possess such powers as are conferred by the legislature; that they are a part of the machinery of the State government and perform important municipal functions, subject to the regulation and control of the legislature. In short, that the act was the mere exercise of the unquestioned power of the legislature to determine what highways should be constructed and of the taxing power in providing means to defray the expense incurred in their construction. But it is said in the opinion that if the object of the expenditure was private, or if the money to be raised was directed to be paid to a private corporation, which is authorized to use the improvement for private gain, the question would be quite different, and in this respect there is a limit beyond which legislative power cannot legitimately be exercised. It is manifest that the question presented in the present case was not determined in that, unless it shall be further held that a railroad owned and controlled by a corporation and operated by it for the benefit of its stockholders is a public highway in the same sense as the common roads of the country. The towns through which the latter run may be compelled to construct and keep them in repair for the common use of the public. The substantial question in the present case is whether they may be so compelled to construct and repair railroads owned and operated by corporations for the benefit of the stockholders. It is clear that they may be, if they are public highways in the same sense as common roads. It has been uniformly held that the right of eminent domain may be exercised so far in behalf of a railroad corporation as is necessary for the construction and operation of the road upon the ground that the road and its operation was for a public purpose, and therefore the real estate condemned for its use was taken for public and not private *Page 140 
use. But it is equally clear that property acquired by the corporation belongs to it exclusively, and its ownership is as absolute as that of any private individual of property belonging to him. It is also clear that so far as the road is operated for the benefit of its stockholders, the corporation is private. We have then an artificial being, created by the legislature, endowed with public franchises, the absolute owner of property of which it cannot be deprived by legislation except for public purposes, carrying on business for the private emolument of its stockholders. The People v. Flagg determines that towns may be compelled to provide for the construction and maintenance of improvements of a public character exclusively. But here we have an attempt to compel them to aid in the construction of a work public in some respects, but private in others, of at least equal importance. It is said that municipal corporations are creatures of the legislature and subject to its control. In a certain sense this is true. They are created by the legislature as instrumentalities of the government, and so far as legislation for governmental purposes is concerned are absolutely subject to its control. The powers of legislation over individuals is given to the legislature for all the purposes of government, subject to such restrictions as are contained in the Constitution. Yet no one would claim that an individual could be compelled by a statute to exchange his note or bond and mortgage with a railroad corporation for its stock, against his will, upon such terms as were prescribed in the act or any other. It is within the province of legislation to provide for enforcing the performance of contracts when made; but to enforce the making of them by individuals is entirely beyond it. We have seen that municipal corporations may be compelled to enter into contracts for an exclusive public purpose; but I think they cannot be when the purpose is private. This is equally beyond the province of legislation in the case of such corporations as in those of private corporations or individuals. In Atkins v. The Town ofRandolph (31 Vermont, 226) it was held that *Page 141 
an act providing for the appointment of an agent of the town by the county commissioner, with power to purchase liquors on the credit of the town, and to sell the same for certain specified purposes, and account for and pay over the proceeds to the town as prescribed, was unconstitutional; and the town, not having consented to the appointment or ratified the contract, was not liable for the liquors purchased upon its credit by such agent pursuant to the act. This judgment is based upon the grounds that the legislative power over municipal corporations is not supreme, and does not include the power of compelling them to enter into contracts of a private character, although such contracts would conduce to the public good by enabling the government to suppress traffic in intoxicating liquors. In the Western Saving FundSociety of Philadelphia v. The City of Philadelphia (31 Penn., 185) it was held that when a municipal corporation engages in things not public in their nature, it acts as a private individual; and in the same case, between the same parties (id., 175), it was held that it so acted in supplying its inhabitants with gas. In Bailey v. The Mayor, etc. (3 Hill, 531), it was held that a municipal corporation was to be regarded as private as to its ownership of lands and other property; and that the test whether powers exercised by a municipal corporation were public or private was whether they were for the benefit and emolument of the corporation or for public purposes; and it was further held that the city of New York, under the act to supply the city with pure and wholesome water (Laws 1834, p. 451) acted as a private corporation, and was responsible as such for the acts of those appointed by the act, for the reason that the corporation had accepted of and consented to the act. Surely a town acts as a private corporation in becoming a stockholder of a railroad corporation, and, as such, interested in the operation of the road for the benefit of the stockholders. When a municipal acts as a private corporation it acts as an individual. InTaylor v. Porter (4 Hill, 140) it was tersely said by BRONSON, J., that the power of making bargains for individuals has not *Page 142 
been conferred upon any department of the government. In ThePeople v. Morris (13 Wend., 325) the distinction between the nature of the action of public and private corporations is clearly given.
Olcott v. The Board of Supervisors of Fond du Lac (16 Wallace, 678), recently decided in the Supreme Court of the United States, is cited as decisive of the question now under consideration in the present case. But this question was not in that case. That action was for the recovery of notes and orders issued by the county to the Sheboygan and Fond du Lac Railroad Company, in pursuance of an enabling act passed by the legislature, which required such issue to be approved by a majority of the votes given at an election to be held for the purpose of determining whether such majority approved of such issue. The question was whether the enabling act was constitutional. The Circuit Court held it was not, and gave judgment for the defendant upon the ground that the Supreme Court of Wisconsin had previously so determined, and that, as the question was whether an act of the State legislature was authorized by the Constitution of the State, the federal courts must adopt the determination of the State courts. This judgment was reversed by the Supreme Court, the chief justice and Justices DAVIS and MILLER dissenting. Upon the question involved the Supreme Court has no appellate jurisdiction from judgments of the State courts; and, hence, its judgment is not controlling in the determination. I concur in the views of the dissenting justices, that, when the federal courts acquire jurisdiction by reason of the residence of the parties, they ought, in such questions, to follow the determination of the courts of the State. Justice STRONG, in the prevailing opinion, holds that the taxing power can be exercised for public purposes only; but insists that the construction of railroads falls within this class, and that the taxing power may be resorted to therefor. But the exercise of the taxing power, either general or local, for this purpose is altogether different from compelling a town to take stock in the corporation without its *Page 143 
consent, and to that extent engage in the business of a common carrier. I think it would not be claimed that a town could be compelled to become a stockholder in a banking or manufacturing corporation, although it appeared that the particular corporation would largely promote the public interest where the business was conducted. Such legislation could only be sustained by holding the power of the legislature supreme over municipal corporations for private as well as public purposes. Upon principle and authority I think it is not as to the former, although it is as to the latter. The test is, whether the purpose to be effected is public or private; if the former, a mandatory statute is valid. If the latter, it is not within the province of legislation, and consequently not within the power of the legislature, and the act is, therefore, void. We have seen that a railroad corporation possesses some of the characteristics of both; public, as to its franchises; private, as to the ownership of its property and its relations to its stockholders. Were it exclusively public the act of 1870 would be valid, but void if exclusively private. It follows that, as the legislature is supreme only as to public purposes, and as the act in question relates in part to private, that to this extent it is void; and as the latter is inseparably connected with the former, the entire act must be held void. InSweet v. Hulbert (51 Barb., 312) it was held that an enabling act to issue bonds and donate the same or the proceeds to a railroad corporation to aid in the construction of its road was void. It is unnecessary to go as far in the present case. It is argued that the power of taxation for any purpose is supreme, and such power may be exercised upon the State at large, or any particular locality, in the discretion of the legislature; and that the act in question is but the mere exercise of this power of taxation, and therefore valid. The People v. The Mayor ofBrooklyn (4 Com., 419); and Town of Guilford v. TheSupervisors of Chenango are relied upon to sustain the position. These cases do not go quite as far as claimed by the counsel. The former only determines that an act providing for the expense incurred in *Page 144 
grading and improving the streets of a city by assessments upon the property benefited is a legitimate exercise of the taxing power, and therefore valid; and the latter that the legislature can recognize claims founded in equity and justice, in the largest sense of these terms, or in gratitude and charity, and provide for their payment by imposing a tax upon those who ought to pay them. The act in question cannot be maintained upon the taxing power. A municipal corporation cannot be compelled to embark in a business of a private character, because its prosecution by it will probably or certainly lead to its taxation for the capital to be invested or expenses incurred therein. The above view renders an examination of the other questions discussed unnecessary.
The judgment appealed from must be reversed and a judgment rendered declaring the relator not entitled to a peremptory writ, and dismissing the proceedings, with costs to the appellant.
CHURCH, Ch. J., ALLEN and PECKHAM, JJ., concur.
FOLGER, J., concurs in result.
ANDREWS, J., dissents RAPALLO, J., does not vote.