## Lawrence E. Tierney Coal Company v. Smith's Guardian, et al.

(Decided June 4, 1918.)

### Appeal from Pike Circuit Court.

1. Constitutional Law—Statutes—Guardian and Ward—Leasing Land of Infant or Person Under Disability, or Mineral Interest Therein, Beyond His Disability.—An act of the legislature that authorizes the leasing of the coal, oil or gas interests in land owned by infants or persons of unsound mind for a period of time extending beyond the disability is void insofar as it authorizes the leasing to extend after the disability has been removed.

2. Guardian and Ward—Infants.—A guardian may lease the land of his ward, or any mineral interest therein, for a period covering the minority of the ward, but no longer.

3. Insane Persons—Leasing of Land or Mineral Rights of.—A curator or committee of a person of unsound mind may lease the lands or mineral interest therein of the person of unsound mind for a period of time not extending beyond the removal of his disabilities.

4. Constitutional Law—Power of Courts to Annul Legislative Act.—A legislative act will not be declared void unless the legislation was prohibited by the Constitution. There are no restraints upon the authority of the legislative department except those imposed by the Federal and State Constitutions.

5. Constitutional Law—Leasing of Land or Interests Therein—Period of Time Lease May Run.—An act of the legislature authorizing the leasing of the lands of infants and persons of unsound mind, and the mineral interests therein, for a period of time extending beyond the removal of the disability violates the sections of the Constitution granting to citizens the right to seek and pursue their happiness; to acquire and protect their property; and also the prohibition against taking a person's property for a private purpose without his consent.

6. Constitutional Law—Property Rights—Possession and Control of Property of Adult of Sound Mind Can Not Be Taken for a Private Use.—The legislature has no power to authorize a court to

take property or the control or possession of it out of the hands of an adult person of sound mind for a private purpose. The right of the citizen of sound mind to manage and control his property can not be interfered with.

7. Constitutional Law—Construction of Constitution—Prohibitions.— Where fundamental rights are declared by the Constitution, it is not necessary that it should, at the same time, prohibit the legislature, in express terms, from taking them away. The declaration itself is a prohibition. The constitutional prohibition against taking property for a public use, without just compensation, precludes the idea that it may be taken without the owner's consent for a private use.

8. Constitutional Law—Right of Acquiring and Protecting Property— Meaning of.—The right of acquiring and protecting property carries with it the right of control and dominion, and a citizen can no more be deprived of his right of control and dominion than of his right of acquisition and protection.

AUXIER, HARMAN & FRANCIS for appellant.

P. B. STRATTON, JESSE D. KASH and J. R. JOHNSON, JR., for appellees.

OPINION OF THE COURT BY JUDGE CARROLL—Reversing.

This case presents the important question, whether a circuit court, pursuant to legislative authority so to do, has the power to lease the mineral land of infants for a term of years beyond their minority, and brings before us the validity of the legislative act, attempting to confer upon the circuit court the power exercised in this case.

The question comes up in this way: In 1916 the legislature enacted a statute providing in section 1: "That the guardian of an infant, curator or the committee of a person of unsound mind may lease the real estate, or any interest therein, of such infant or person of unsound mind for the purpose of mining and removing all or part of the coal, oil, gas and any or all other mineral or mineral substances and products therein; together with the usual and reasonably necessary privileges to mine, bore for, store, pump and remove the same, and similar products taken from other land, and the right to dump upon said land refuse or other products taken therefrom and from other land; and to erect upon said land miners' houses, commissaries and hotels and other houses and equipment reasonably necessary to enable the lessee to carry on the business in the most

economical way. Such lease may be for such length of time as the guardian, curator or committee may approve, without being limited to the time at which the liability of such infant or person of unsound mind may be removed."

In section 2, it was provided that no such lease shall be made until the guardian, curator or committee shall have filed, in the office of the circuit court clerk, a petition against the infants or person of unsound mind, setting forth a description of the land, and showing the propriety of making a lease thereto.

In section 3 it was provided that a guardian *ad litem* should be appointed to protect the interest of the infants, or the person of unsound mind, and in section 4 that the court should hear and dispose of the case upon the evidence taken, and if it was made to appear by the evidence of at least two creditable witnesses that the interests of the infants, or person of unsound mind, would be promoted by the lease, the court should order that the property be leased and prescribe the royalty to be paid. Sections 5, 6, 7 and 8 relate to the practice and procedure, and prescribe the descent of the estate upon the death of the infants, or persons or unsound mind, without having disposed of the same.

In section 9 it was provided that the guardian, curator or committee should settle from time to time his accounts "and upon the infant becoming of age or the person of unsound mind becoming of sound mind shall make a final and complete settlement of all amounts received under such lease, and account for the same as herein and by law provided; and shall thereupon be discharged from further duty or accountability as such guardian or committee. Thereafter the rights and obligations of such former infant or person of unsound mind and the lessee shall be the same as if the lease had been executed originally to the lessee by a person over twenty-one years of age and free from any disability."

In 1917, Jesse D. Kash, as statutory guardian of Octavia, Jake and Ike Smith, filed his petition in the Pike circuit court against these infants averring that Octavia was 11, Ike 16 and Jake 18 years of age; that they were the owners of about 2,500 acres of land devised by the will of Jacob Smith, in 1906, to their father for life, with remainder to them in fee; that the land was unfit for cultivation on account of its rough and mountainous char-

acter, and its sole value consisted in the coal thereon; that the infants have no income, and if they were permitted to lease the coal and mining rights in the land, the royalty derived therefrom would be sufficient to educate and maintain them; he prayed that the court enter a decree authorizing him to lease the property for coal mining purposes, pursuant to the terms of a lease proposed to be made between these infants by Kash as their guardian of the one part and the Lawrence E. Tierney Coal Company of the other part. This lease stipulated that the grantors, in consideration of certain royalties, provided for, leased all of the coal in and under the land to the coal company for a period of forty years, with the privilege of renewal for an additional term of forty years. The lease further contained a number of stipulations providing for the use and occupation of the property by the coal company to enable it to mine and deliver the coal, and then provided that the lessee should pay to the lessors, during the continuance of the lease, or any renewal thereof, a royalty of ten cents for each ton of coal produced from the land and fifteen cents for each ton of coke that might be manufactured on the premises, the minimum royalty to be $5,000 for the first year, $10,000.00 for the second and $15,000.00 for the third, and each year thereafter.

After this, the infants were properly brought before the court and a guardian *ad litem* was appointed to represent them, and he filed a report reciting that, in his opinion, the lease would be beneficial to them. Thereupon evidence was taken supporting the averments of the petition and afterwards the court rendered a judgment authorizing the guardian, Kash, to lease the land for a period of forty years with the privilege of renewal for forty years for the purpose of mining and removing coal therefrom, with the usual privileges contained in such leases. The judgment further recited that the conditions of the lease, filed with the petition, were reasonable and satisfactory, and that the guardian should lease the coal privileges in the land under and according to the terms of the form of lease filed with the petition at public outcry, reserving to the court the right to reject any and all bids.

Following this the privileges as set out in the lease filed with the petition, were sold pursuant to the judgment, and the Lawrence E. Tierney Coal Company, be-

ing the only bidder, became the purchaser under the terms of the lease heretofore referred to.   Formal exceptions were filed to the report of sale by the company and overruled, and it prosecutes this appeal for the purpose of having the correctness of the judgment, and the rulings of the court in respect to the exceptions determined by this court in order that there might be no questions about the validity of the lease, and its rights and privileges thereunder.

It may here be remarked that the proceedings had in the lower court were in conformity with the provisions of the act, and so, if there were no objections to its validity, the judgment should be affirmed.

At this point we may digress a moment to briefly review the state of the law previous to the act of 1916. In sections 489-498 of the Civil Code, provision is made for the sale of the real estate of infants and persons of unsound mind.   But the sale of the real estate of infants and persons of unsound mind, under these code provisions, is only allowable: (1) For the purpose of paying a debt of the ancestor with which the infant or person of unsound mind may be chargeable; (2) for the purpose of paying the debts of the infant or person of unsound mind; (3) for the maintenance and education of the infant, and the maintenance of the persons of unsound mind and their families; (4) for purposes of reinvestment in other property.   It has also been frequently and consistently held that courts of equity have no inherent power to sell, for any purpose, the real estate of infants or persons of unsound mind, and that when it is sought to sell their real estate express authority for the sale must be found in statutory provisions, and these provisions must be strictly complied with. Walker v. Smyser, 80 Ky. 620; Elliott v. Fowler, 112 Ky. 376.

It is further provided in section 2031 of the Kentucky Statutes that a guardian "may lease any real estate of the ward until the ward shall arrive at the full age, but no such lease shall be made for a longer term than seven years."   So that before the act of 1916, a court of equity could not lease for a longer term than the minority of the infant his real estate or any interest, mineral or otherwise, therein nor could his real estate, or any part thereof or interest therein be sold for any pur-

poses except those pointed out in the statutory provisions referred to.

It had always been the policy of the state, as expressed in legislative enactments and court opinions, to guard with jealous care the property rights of infants and persons under disability, and it was never thought that the courts had any power to undertake to regulate or control, in any manner, by proceedings brought during infancy, the estate after the infant had arrived at full age, or the disability was removed. When either of these contingencies happened then the person who had been an infant or who had been laboring under some legal disability was restored to his rightful status as a citizen of the state entitled to the free and unrestrained use and management of his property to the same extent as that of any other person of full age and sound mind.

But the act of 1916 undertook to make a radical and sweeping change in this time-honored public policy of the state, and to give to circuit courts, having general equity jurisdiction, powers not only to regulate and control the estates of infants and persons of unsound mind, during the infancy or period of disability, but to project this regulation and control far beyond the time theretofore prescribed and long after the infant had arrived at age or the disability had been removed, and the question is, did the legislature have this power?

In determining this question, we have not overlooked the fact, so often declared by this court, that a legislative act will not be declared invalid unless the legislation was prohibited by the Constitution, because the rule long pursued by this court, and generally observed by other courts, is that there are no restraints upon the authority of the legislative department except those imposed by the Federal and State Constitutions. Thus it was said in Johnson v. Higgins, 3 Met. 514, that: "The duty, and sole duty, of this department of the government, when the constitutional power of the legislature to enact a law is questioned, is to look to the provisions of the Federal and State Constitutions, and if they do not, in express terms, or by necessary and proper implication, forbid the exercise of such power, the enactment must be adjudged valid and enforceable as a law. Beyond the constitutional restrictions thus to be interpreted, the only limits upon the state legislature in enacting laws are its own wisdom, sound judgment, and

patriotism. And it may be added, that in doubtful cases, where it is not clear that the fundamental law has not been invaded, courts rarely, if ever, interfere to arrest the operation of legislative enactments. Respect for the wisdom of a co-ordinate department of the government, as well as sound policy, forbids such interposition except upon clear and satisfactory grounds.'' And again in Commonwealth v. Goldburg, 167 Ky. 96, we said: ''Laws cannot be disregarded merely because they are supposed to be repugnant to some governmental principles that lie outside of constitutional limitations. The Constitution of this state, in sections 27 and 28, distributing the powers of government, confided to the legislative branch the authority to enact laws, and this authority the judiciary is not at liberty to interfere with unless the legislation violates directly or by necessary implication some provision of the State or Federal Constitution. Subject to this limitation, the policy of the legislation or the wisdom or the propriety of it, is not for the judicial branch of the government to decide. When the courts have exercised their jurisdiction in restraining the legislature from transgressing constitutional bounds, they have reached the limit of their control. The people put in the Constitution such limitations as they wished to impose on the legislative branch, and within these limitations its activities are controlled by the Constitution; but outside of them it may act with a free hand, subject, of course, to the restraint imposed by the Federal Constitution. So that when the validity of legislation is challenged in the courts, the inquiry is limited to the questions, what provision of the Constitution does it violate? What does it do or propose to do that the Constitution forbids?.

Therefore, whatever our opinion might be as to the policy of this legislation we are not at liberty to set it aside on the ground that it is unwise and detrimental to the best interests of the citizens of the state to permit courts to take out of their hands, when laboring under no disability, the power to manage and control their own property. Fortunately, however, we think there can be found in the Constitution of the state ample authority for holding this legislation invalid.

In the Bill of Rights, among the great and essential principles of liberty and free government, we find it declared that: ''All men are, by nature, free and equal,

and have certain inherent and inalienable rights, among which may be reckoned . . . the right of seeking and pursuing their ·safety and happiness. .. . . . The right of acquiring and protecting property. . . . Absolute and arbitrary power over the lives, liberty and property of freemen exists nowhere in a republic, not even in the largest majority. . . . Nor can he be deprived of his life, liberty ·or property, unless by the judgment of his peers or the law of the land: . . . No person shall, for the same offense, be twice put in jeopardy of his life or limb, nor shall any man's property be taken or applied to public use without the consent of his representatives, and without just compensation being previously made to him.''

These provisions of the Bill of Rights, which will be found in every Constitution of the state, bear striking testimony to the high regard in which the people of the state have always held the right to acquire, enjoy and dispose of property. They placed it in the same class with life and liberty, and surrounding its use and enjoyment with the same safeguards; nor is it singular that they should have done this because in the whole history of the world, civilized people have always recognized that the right of the individual, free from disability, to acquire, use, enjoy and dispose of his property, free from the control, restraint, or dominion of any other person or set of persons, was indispensable to the happiness of an enlightened people. Thus Blackstone, in his Commentaries, book 1, page 93, in speaking of the absolute rights of persons, said: ''And these may be reduced to three principal or primary articles; the right of personal security, the right of personal liberty, and the right of private property; because, as there is no other known method of compulsion, or of abridging man's natural free will, but by an infringment or diminution of one or other of these important rights, the preservation of these, inviolate, may justly be said to include the preservation of our civil immunities in their largest and most extensive sense.''

And in equally strong, if less eloquent language, Cooley, in his Constitutional Limitations, page 475, says: ''The right of every man to do what he will with his own, not interfering with the reciprocal right of others, is accepted among the fundamentals of our law. The

instances of attempt to interfere with it have not been numerous since the early colonial days.  A notable instance of an attempt to substitute the legislative judgment for that of the proprietor, regarding the manner in which he should use and employ his property, may be mentioned.  In the state of Kentucky, at an early day, an act was passed to compel the owners of wild lands to make certain improvements upon them within a specified time, and it declared them forfeited to the state in case the statute was not complied with.  It would be difficult to frame, consistently with the general principles of free government, a plausible argument in support of such a statute.''  And our own court has added its potent voice in support of this ancient and highly-valued principle, in the following language, found in Davis v. Ballard, 1 J. J. M. 563: ''The enjoyment of life, liberty and property, and the right to pursue happiness, embrace all the comforts and pleasures which man's physical, intellectual and moral nature is capable of acquiring, by the application and exercise of the various faculties with which he is endowed, and all that the world can afford him.  The right to pursue happiness includes the right to use all means necessary for its attainment, by the proper exercise of our faculties.  The acquisition of property, to some extent at least, is indispensable to our most limited idea of happiness.  Food and raiment are property; and without food and raiment existence can not be preserved many days.  Whether our acquisitions shall be limited to a bare subsistence, or shall be multiplied by the accumulation of every luxury, will depend upon the degree of labor employed, and the success of the business to which it may be directed; but it equally results, whether we have much or little, that one of the objects in the formation of the Constitution was to secure the enjoyment of that which we do possess and own.''

Many other authorities declaring a like doctrine might be referred to, but we deem it unnecessary to lengthen this opinion with citations approving a sentiment that is the common experience of mankind, and the effect of which is observed by all of us in the every-day affairs of life.  No man can fail to have noted how eager our people are to acquire property; how tenaciously they hold it, and how bitterly they resist even the most

trifling hostile or unwelcome intrusion upon the right, and so it is easy to understand how necessary possession and dominion of property is to the happiness of the people, and how discontented the normal man would be to find himself the owner of an estate, but without the right of possession and control, so dear to the desires and ambitions of manhood.

Nor is this craving for dominion, that is the natural inheritance of the race, to be satisfied by income received from the hands of another. What virile men want, in connection with property, is the pride and happiness that spring from exclusive control and the undivided right to do as they please with it; or as finely said by Blackstone, in book 2, page 1: "There is nothing which so generally strikes the imagination, and engages the affection of mankind as the right of property; or that sole and despotic dominion which one man claims and exercises over the external things of the world, in total exclusion of the right of any other individual in the universe."

Having its origin in the human feeling that perhaps found its first permanent expression in the Great Charter, this love of sole dominion has been handed down for centuries as a part of the heritage of every free and civilized people.

Influenced by conditions such as we have attempted to set forth, the Constitution makers, from the beginning of the state, have put together in the same class, and in the order named, life, liberty and property, as the most highly treasured rights of our people, and any interference with the exclusive dominion of the adult citizen of sound mind over his property, unless sanctioned by the Constitution and laws made pursuant thereto, is a denial of the right of seeking and pursuing his happiness guaranteed by the Constitution.

Keeping now in mind the exacting care with which constitutions and courts have guarded the right of the citizen from any attempt to interfere with his exclusive enjoyment of property owned, we may stop here a moment to have clearly before us just what this act of 1916 does, as exhibited in the case we have. Here are three infants, one 11, one 16, and the other 18 years of age; they own the fee simple title, subject to a life estate, in a body of land in one of the great coal producing counties of the state, the value of the coal in which, we

may say without exaggeration, is many millions of dollars. One of these infants, in about two years from now, will have reached his majority; the other in about four years; and the other in about nine years; at which times each of them, free from any restraints, except those imposed by the judgment of the Pike circuit court, would come into the full possession and enjoyment of this enormously valuable body of land, and each of them, when he had reached his majority, would have the undisputed right to manage, control and enjoy it to the same extent as any other adult citizen of sound mind in the state would have the right to manage, control and enjoy his property. But if the judgment stands, Jake, when he reaches his majority in two years from now, and when he might reasonably expect to come into the possession and enjoyment of his estate, like any other citizen, will find that shortly before he arrived at age, the circuit court of Pike county had leased his land, or at least the only valuable part of it, for a term of forty years, with the privilege, on the part of the lessee, to extend the lease for forty years, so that Jake, if he lived to be a centenarian, would at the end of his life come into the full possession of his estate for the first time. It is, however, probable, if not certain, that he would never live to see the day when he would come into the use and possession of this property, given to him in his infancy. It is, of course, true that he will derive from it each year a valuable income, but this falls far short of the exclusive dominion that every adult citizen, of sound mind, desires to and should have the high privilege of exercising over his own property.

And entirely aside from the constitutional prohibitions against its exercise it seems to us an intolerable situation that the legislature of the state should have the power, through the instrumentality of the court, to take from a person, in his infancy, for the full period of his life, the right to the use and enjoyment of property that except for this he would come into the full possession of when he reached his majority, and viewed in the light of the constitutional guarantees referred to it would be folly to say that the citizen has the inalienable right to acquire, hold and enjoy property, if by legislative declaration it may be taken from him in the manner attempted in this case. The declarations by which

the right of the citizen to exercise dominion over his property were permanently secured would have little meaning if he could be deprived of its control and possession by the decree of a court, pursuant to a legislative enactment like the one here in question.

Everybody will readily admit that the legislature could not, by any enactment, take from an adult citizen, of sound mind, the right to control and manage his property, although it should be said that such exercises of arbitrary power have been attempted more than once, but in every instance the efforts were met and set aside by judicial authority.

Thus in Wilkinson v. Leland, 2 Peters, U. S. 7 Law Ed. 542, the Supreme Court of the United States said: "That government can scarcely be deemed to be free where the rights of property are left solely dependent upon the will of a legislative body without any restraint. The fundamental maxims of a free government seem to require that the rights of personal liberty and private property shall be held sacred.  At least no court of justice in this country would be warranted in assuming that the power to violate and disregard them—a power so repugnant to the common principles of justice and civil liberty—lurked under any general grant of legislative authority, or ought to be implied from any general expressions of the will of the people.  The people ought not to be presumed to part with rights so vital to their security and well-being, without very strong and direct expressions of such an intention.  In Terrett v. Taylor (9 Cranch, 43) it was held by this court that a grant or title to lands once made by the legislature to any person or corporation is irrevocable, and cannot be reassumed by any subsequent legislative act; and that a different doctrine is utterly inconsistent with the great and fundamental principle of a republican government, and with the right of the citizens to the free enjoyment of their property lawfully acquired.  We know of no case in which a legislative act to transfer the property of A to B without his consent has ever been held a constitutional exercise of legislative power in any state in the union.  On the contrary, it has been constantly resisted as inconsistent with just principles by every judicial tribunal in which it has been attempted to be enforced."

In People v. Morris, 13 Wend. 325, the Supreme Court of New York, said: "It is now considered an universal and fundamental proposition in every well regulated and properly administered government, whether embodied in a constitutional form or not, that private property can not be taken for strictly private purposes at all, nor for public without a just compensation; and that the obligation of contracts cannot be abrogated or essentially impaired. These and other vested rights of the citizen are held sacred and inviolable, even against the plenitude of power of the legislative department."

And in Ervine's Appeal, 16 Pa. St. 256, the Supreme Court of Pennsylvania said: "If the legislature possessed an irresponsible power over every man's private estate, whether acquired by will, by deed, or by inheritance, all inducement to acquisition, to industry and economy would be removed. The principal object of government is the administration of justice and the promotion of morals. But if property is subject to the caprice of an annual assemblage of legislators acting, tumultuously, and without rule or precedent, and without hearing the party, stability in property will cease, and justice be at an end. If the government is interdicted from taking private property even for public use without just compensation, how can the legislature take it from one man and dispose of it as they think fit? The great principle is, that a man's property is his own, and that he shall enjoy it according to his pleasure (injuring no other men) until it is proved in due process of law that it is not his, but belongs to another. Many acts of assembly have been passed, it is true, authorizing guardians, trustees and executors to convey lands. This power has been sustained by this court where the persons in interest were minors and lunatics, and could not act for themselves, and where the guardian, &c., requested the passage of the laws."

And our court, in Gossom v. McFerran, 79 Ky. 236, in holding so much of section 491 of the Civil Code as attempted to authorize the sale of an adult's land against his consent unconstitutional, said: "Where any of the citizens are incapacitated to act for themselves, it becomes the duty of the state to protect their interests, and it is upon this idea and for this reason that jurisdiction has been conferred upon the courts to sell and reinvest the proceeds of property belonging to such per-

sons when in the judgment of the court it is to their interest. The court acts and consents for them because they cannot act or consent for themselves. But so long as the citizen is under no legal disability to act for himself in the management of his property he is protected by the Constitution from interference on the part of the state, whether that interference comes directly by legislative act, operating immediately upon the property, or intermediately through the courts.''

But, it is said that this legislation only operated on the property and affects the rights of infants and persons of unsound mind. In a limited sense this is true, and there could be no objection to the legislation if its course was stopped when the disability of the person affected was removed. But, as we have seen, it does not stop there, it continues to restrain his rights, to deprive him of his property, and to deny him the exercise of acts of ownership over it after the disability is removed, to the same full extent that it does during the continuance of the disability.

Nor can it be said that because courts of equity have always exercised the power within the limitations prescribed by the code to sell the lands of infants and persons of unsound mind, thereby divesting them completely of title thereto, that there is no substantial difference between that method of taking from the infant, or person of unsound mind, his estate and the method employed by leasing it in the manner authorized by this legislation.

The difference between the sale of an infant's land for purposes of reinvestment, or for his education and maintenance, and the leasing of it for a period of time long beyond his infancy, is so obvious that it scarcely need be distinguished. When the land of an infant is sold for purposes of reinvestment, there is only a change in the character, or perhaps, the location of his estate. The principal fund remains intact to come into his possession when he reached his majority. If his estate is sold for his education and maintenance during infancy only so much of it as may be necessary for this purpose can be sold, or if more, it will be reinvested in other property over which he will have exclusive dominion and control when the period of his minority is over.

When, however, the whole estate is seized during his infancy, and at a time when he is presumed to be in-

capable of acting for himself, and leased for a term of years that will, under ordinary conditions, extend far beyond the period of his life, the legislature, through the instrumentality of the court, is assuming to exercise a guardianship, for life, over his affairs that is only tolerated in cases of infancy and mental unsoundness.

There could scarcely be conceived any legislation that would be more obnoxious to the Constitution or offensive to the instincts of vigorous men than to make them, by legislative action and without their consent, the beneficiaries for life of the bounty of a lessee to whose keeping their estates had been committed.

It is true that the Constitution does not, in express terms, forbid the taking of the property of the citizen out of his possession and placing it in the control and possession of another, and yet it has always been agreed that this could not be done except for some public purpose. As said by Cooley, in his Constitutional Limitations, page 209: "Nor, where fundamental rights are declared by the Constitution, is it necessary at the same time to prohibit the legislature, in express terms, from taking them away. The declaration is itself a prohibition, and is inserted in the Constitution for the express purpose of operating as a restriction upon legislative power. Many things, indeed, which are contained in the bills of rights to be found in the American Constitutions are not, and from the very nature of the case, cannot be so certain and definite in character as to form rules for judicial decisions; and they are declared rather as guides to the legislative judgment than as marking an absolute limitation of power. The nature of the declaration will generally enable us to determine without difficulty whether it is the one thing or the other. . . . So the forms prescribed for legislative action are in the nature of limitations upon its authority. The constitutional provisions which established them are equivalent to a declaration that the legislative power shall be exercised under these forms, and shall not be exercised under any other. A statute which does not observe them will plainly be ineffectual."

And so, when the Constitution declares that no man's property shall be taken or applied to public use, without just compensation, this precludes the idea that it may be taken without his consent under any circumstances or conditions for a private use; and when it declares that

the right of acquiring, and protecting property is among the inalienable rights of the citizen, this right of acquiring and protecting carries with it the right of control and dominion, and a citizen can no more be deprived of his right of control and dominion than he can be deprived of his right of acquisition and protection.

Accordingly, this legislation, in our opinion, is violative of the true intent and meaning of the constitutional provisions contained in the Bill of Rights declaring that: (1) the right of seeking and pursuing their . . . happiness; (2) the right of acquiring and protecting property, are among the inalienable rights of the citizen, and further that (3) no man's property shall be taken except for public purposes.

We have, however, discovered some authority holding a contrary view to that herein expressed, and to this authority some reference should be made.

The Oklahoma court, in Cabin Valley Mining Co. v. Mary Hall, Okla. L. R. A. 1916, F 493, held that under the law of that state, a guardian, when authorized by the county court so to do, might execute an oil and gas lease upon the lands of an infant for a period of years extending beyond his minority, when it appeared that the best interests of the infant would be subserved by the lease; and the United States Circuit Court of Appeals, in Mallen v. Ruth Oil Company, 231 Federal 845, in considering the validity of an Oklahoma lease, made by the guardian of an infant for a period of time extending beyond his minority, ruled that under the laws of the state of Oklahoma such a lease might be made by the guardian with the approval of the court, when it appeared to be for the best interest of the infant. In Ricordi v. Gaboury, 115 Tenn. 485, the Tennessee court approved a lease of infant's land for a period of ninety-nine years, upon the ground that it clearly appeared that the interests of the infant would be benefited by the lease. The Arkansas court, in Beauchamp v. Bertig, 90 Ark. 350, 23 L. R. A. (N. S.) 659, also held valid the lease of an infant's interest in land for a period beyond his minority, when it appeared that it would be beneficial to his interests. The Alabama court, in McCreary v. Billing, 176 Ala. 314, 35 Ann. Cases 561, also upheld a long-time lease of infants' real estate, upon the ground that it would be beneficial, the court saying: "It guarantees them a nice income, free from care or trouble, with

ironclad security for same, until they reach middle life, the age of wisdom and discretion.''

In all of these cases it would seem that the court was influenced to give its approval to a lease of infants' land, or interest therein, that would extend far beyond the minority of the infant, upon the ground that the best interest of the infant would be promoted by the lease. But, with all due respect for the ability and learning of these courts, it seems to us that they have failed to give proper significance to the burden imposed by the lease upon the person affected after he has reached his majority, and would be presumed to have the ability and capacity, as well as the desire, to manage and control his own property. It is, of course, well enough that the best interest of the infant should be the sole guide in the leasing and disposition of his estate by the court, but its superintending and supervising jurisdiction and authority should end with the infancy. These courts, in the opinions referred to, have not only undertaken to control the estate during infancy, but for many years thereafter, and it would seem, as we have before said, that there is little, if any, difference between leasing the land of a young man of 18 years for ninety-nine years and leasing the land of a young man of 21 for ninety-six years. Yet, we venture the assertion that no one of these courts would sustain the ruling of an inferior court, although pursuant to legislative authority, if the ruling undertook to lease, without his consent, for any period of years, or for any time, the land or any interest therein of a sound-minded young man who was over 21 years of age.

It should, however, be observed that in no one of these cases was any reference made to constitutional provisions prohibiting courts from exercising authority or control over the estates of adults although it might be thought beneficial or helpful to the adult to have the management of his property taken out of his hands. In some of the cases referred to, it seems to have been assumed that in the absence of legislation the courts had the power exercised, and in others full justification for the judgment was found in statutory provisions.

It may be true, as said in these cases, that the interest of the infant would be benefited by the execution of

a lease extending beyond his minority in the sense that he might, during infancy, be able to realize a larger income from the lease than he would get if it terminated with his minority, and it may be true that the arrangement would yield to him, after reaching manhood, a greater financial profit than he could realize from it by his own endeavors. But considerations like these should, as we think, have little weight in determining what our judgment should be. The guardianship of the courts should be confined to persons under disability and therefore presumed to be unable to protect themselves, and all others should be left to their own endeavor, whether it means success or failure. This is the spirit of a Constitution that speaks the best judgment and wisdom of the ages and its directions should not be set aside or ignored to promote the personal convenience or advantage of the individual.

It is true that in many wills and trust deeds provision is made for taking the estate out of the hands of the devisee or grantee for many years or during his life and putting in another the right to control and manage it, but it does not follow from this that the courts, acting under legislative direction, should have the same power, although it might appear that the exercise of it would be beneficial to the person affected. There is no room for analogy between the act of giving to a devisee or grantee property burdened with conditions that deprive him of its control, and a legislative act that takes out of the hands of the owner the right to manage and control that which he received free from any restraints upon its control or disposition. In the one case, the devisee or grantee takes the property in the first instance subject to the limitations imposed by the instrument giving it to him, while in the other case he comes into the fee simple title and possession of the property without any limitations, after legal disabilities are removed, upon his right to manage and control it. In the one case, the devisee or grantee voluntarily elects to take the estate burdened with the conditions the instrument granting it contains, while in the other he takes the estate free from any conditions, and thereafter, without his consent, the control and management of it is taken out of his hands.

Upon a careful consideration of the question involved, we think the act of 1916 in so far as it attempts to auth-

orize the leasing, during the infancy or unsoundness of mind of the owner, the "coal, oil, gas and other minerals or mineral substances and products" for a period beyond the minority of the infant, or beyond the period when the disability of the person of unsound mind is removed, is void.

Wherefore, the judgment is reversed with directions to proceed in conformity with this opinion.